Ronald O. BUBAR, Donald J. Nowatzki, William M. Barth, Charles W. Houpt, and John J. Netterberg, Plaintiffs,

v.

AMPCO FOODS, INC., a California corporation; Alexander & Baldwin, Inc., a Hawaii corporation; and Rogers Foods, Inc., a Delaware corporation, Defendants.

and

James F. PALO, Intervenor-Plaintiff.

Civ. No. 80–1010.

United States District Court, D. Idaho.

May 21, 1982.

**3.** *See* n. 1.

Blaine Evans of Elam, Burke, Evans, Boyd & Koontz, Boise, Idaho, Thomas J. Greenan and Christopher Kane of Ferguson & Burdell, Seattle, Wash., for plaintiffs.

Eugene Thomas and R. B. Rock of Moffatt, Thomas, Barrett & Blanton, Chartered, Boise, Idaho, Ronald E. McKinstry and Richard J. Wallis of Bogle & Gates, Seattle, Wash., for Ampco Foods.

Jess Hawley, Jr., of Hawley, Troxell, Ennis & Hawley, Boise, Idaho, George A. Sears and Reginald D. Steer and Susan M. Lowe of Pillsbury, Madison & Sutro, San Francisco, Cal., for Alexander & Baldwin, Inc., and Rogers Foods, Inc.

## MEMORANDUM OPINION

RYAN, District Judge.

This case is properly before the Court on Defendants' Motions for summary judgment.

Plaintiffs, former officers or employees of Defendant Rogers Foods, Inc., have brought suit against Rogers, its sole share-holder, Alexander & Baldwin, Inc., and Ampco Foods, Inc., alleging that the Defendants violated Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) by entering into an agreement for the sale of Rogers' assets to Ampco. Plaintiffs also allege that Alexander & Baldwin had previously entered into a contract to sell Rogers to Plaintiffs, that Ampco knew of that agreement, and that Alexander & Baldwin's sale of Rogers' assets to Ampco constituted common law contract breaches. Plaintiffs seek to recover treble damages against Defendants pursuant to 15 U.S.C. Section 15.

Plaintiffs' Complaint charges that because of the combination and contract of sale which resulted in Ampco acquiring the potato division of Rogers, its alleged principal competitor in the market for fresh and processed potatoes in Eastern Idaho and the Columbia Basin of the States of Oregon and Washington, Plaintiffs have been excluded from entry into this market, and that Defendants' activities have resulted in their illegal monopolization of trade and commerce. Defendants Alexander & Baldwin and Rogers Foods assert that they are entitled to summary judgment in this action on two grounds: First, that there is no basis in fact or law for Plaintiffs' contract claim against those Defendants, and secondly, that there is no basis in fact or law for the Plaintiffs' antitrust claim against those Defendants.

Defendant Ampco Foods, Inc., asserts that it is entitled to summary judgment in this action on the antitrust grounds only, since there is no contractual complaint against Defendant Ampco Foods.

Substantial discovery has been conducted in this action and both Plaintiffs and Defendants have set forth for this Court detailed statements of facts. (Memorandum of Defendants Alexander & Baldwin, Inc., and Rogers Foods, Inc., in support of Motion for summary judgment, pp. 3–7, and Plaintiffs' Memorandum in opposition to Defendants' Motion for summary judgment, pp. 2–14.) The Court believes that the following recitation of material facts, based upon those detailed submissions, facilitates

an understanding of the legal analysis below.

In the summer of 1978, Alexander & Baldwin determined that it would sell off a number of its assets, including Rogers Foods. Plaintiffs Bubar, then Rogers' President, and Nowatzki, then its Vice-President/Finance, concluded after their first meeting with Alexander & Baldwin's chief executive officer, Gilbert Cox, in July 1978, that Alexander & Baldwin intended to sell Rogers or its assets. On behalf of themselves and other members of Rogers' management, Plaintiffs began to investigate whether they could secure financing to purchase Rogers Foods. For the next several months Plaintiffs spoke to a number of venture capitalists and bankers in an effort to locate financing. Plaintiffs did not secure a written agreement from any financial institution or venture capital supplier for any investment arrangement respecting a proposed purchase of Rogers. On November 13, 1978, Alexander & Baldwin publicly announced its divestiture plans. Ampco Foods first heard that Rogers Foods might have been for sale in late October 1978. Representatives of Alexander & Baldwin, Ampco Foods, and Ampco's investment bankers met to discuss a possible sale of Rogers for the first time on November 16, 1978. On December 15, 1978, Ampco offered $10 million for Rogers' potato division assets. Alexander & Baldwin rejected that offer. During these months other companies contacted Alexander & Baldwin regarding their interest in acquiring Rogers' assets.

Throughout November and December 1978, Plaintiff Bubar asked the representatives of Alexander & Baldwin about a possible price for Rogers. In late December, Alexander & Baldwin responded to Bubar's request for a price with a figure of $13.5 million. The Plaintiffs were informed that Ray Evans, Alexander & Baldwin's Vice-President/Finance, would be meeting with other interested purchasers during the week of January 8, 1979. Bubar and Evans agreed to meet on the morning of January 9, 1979.

Throughout the fall and early winter of 1978, the Plaintiffs were involved in discussions with various financial institutions relative to financing the purchase of Rogers. Although no financial institution was prepared to make a final commitment of funds to the project until a firm price for the company had been established, and agreement reached with Alexander & Baldwin, the banks and equity capital organizations that examined the proposed purchase were uniformly enthusiastic. By January 8, 1979, First Capital Corporation, the equity arm of First National Bank of Chicago, and Security Pacific Venture Capital Corporation, an affiliate of the Security Pacific Bank, had together determined that an investment of $2.7 million in equity funding toward Plaintiffs' venture was appropriate, subject to their own internal guidelines which required time to examine the books of Rogers Foods and to be able to substantiate the figures that had been supplied them.

On January 9, 1979, Mr. Evans; Jerome McLaughlin, Alexander & Baldwin's General Counsel; and Mike Ulyshen, Alexander & Baldwin's Executive Vice-President, met with Plaintiffs Bubar and Nowatzki, and Edward Smith, a representative of First Capital Corporation. Mr. Bubar stated that his investment group would pay $13.5 million for Rogers Foods and the parties discussed various other terms of purchase and options to purchase. Mr. Bubar, on behalf of the Plaintiffs, requested 120 days to consummate the purchase, and asked that during such time the management group be awarded exclusive status and be the only party with whom Alexander & Baldwin would negotiate. At the end of the meeting, Mr. Smith estimated that the chances of putting together a deal were 80 percent plus. However, as the meeting ended, Mr. Evans informed the Plaintiffs that he would talk on the telephone with Mr. Cox and would get back to Mr. Bubar later that day. During the evening of January 9, 1979, Mr. Evans informed Mr. Bubar that Alexander & Baldwin had decided to sell the potato division assets to Ampco.

Plaintiffs have asserted that there was an oral agreement struck at the January 9, 1979, meeting. However, Plaintiffs concede that there was never a written contract for the Plaintiffs to buy Rogers Foods from Alexander & Baldwin.

The Defendants assert that their Motions for summary judgment should be granted on the following grounds:

(1) There never was a contract for sale of Rogers' stock to Plaintiffs;

(2) Plaintiffs' contract claim is barred by the statute of frauds;

(3) Plaintiffs lack standing to sue for damages under the antitrust laws; and

(4) There is no evidence of an antitrust conspiracy.

■ Initially, the Court will consider the issue of whether Plaintiffs lack standing to sue for damages under the antitrust laws since a consideration of that issue incorporates the other grounds asserted by Defendants in their Motions for summary judgment. Additionally, standing is a question of law for the Court to determine since Plaintiffs' claim may be dismissed for lack of standing as a matter of law. *John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495 (9th Cir. 1977).

■ The Plaintiff's statutory basis for bringing this private antitrust action under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, is found in Section 4 of the Clayton Act, 15 U.S.C. § 15, which provides:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

The Ninth Circuit has developed a three-part test to be used by this Court in determining the Defendants' challenge to the Plaintiffs' standing to sue for damages under the antitrust laws. Plaintiffs must satisfy each of the three parts of that test to have standing to sue for damages under the antitrust laws. Since the Defendants'

challenge is made at the summary judgment stage of this proceeding, the Court must construe the facts in the light most favorable to Plaintiffs, and determine whether there is a genuine issue of material fact and whether the Defendants are entitled to a judgment as a matter of law as to each of the three parts of this test.

The three-part test is essentially: (1) Whether Plaintiffs have sufficiently alleged an antitrust type violation under Sections 1 and 2 of the Sherman Act; (2) whether Plaintiffs have stated facts sufficient to support their allegations that they have sustained injury to their business or property due to the antitrust type violation; that is, whether Defendants factually caused Plaintiffs' injury; and (3) whether the Plaintiffs' injury falls within the core of Congressional concern underlying the substantive provisions of the antitrust laws allegedly violated, Sherman Act Sections 1 and 2; that is, whether the Defendants legally caused Plaintiffs' injury. *See generally, Solinger v. A & M Records, Inc.*, 586 F.2d 1304 (9th Cir. 1978), *cert. denied*, 441 U.S. 908, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979); *California State Council v. Associated General*, 648 F.2d 527 (9th Cir. 1980), *cert. granted*, ——— U.S. ———, 102 S.Ct. 998, 71 L.Ed.2d 292 (1982); and *Ostrofe v. H. S. Crocker Co., Inc.*, 670 F.2d 1378 (9th Cir. 1982).

For the purposes of this matter, the Court will consider Parts 1 and 3 of the test before it considers the second part of the standing analysis.

Sections 1 and 2 of the Sherman Act provide:

§ 1. Every contract, combination in the form of trust or otherwise or conspiracy in restraint of trade or commerce among the several states . . . is declared illegal.

§ 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states . . . shall be deemed guilty of a felony . . . .

Plaintiffs maintain that the actions and omissions of Defendants establish the exist-

ence of a conspiracy to eliminate a potential competitor from entering the marketplace and that such actions and omissions constitute an illegal monopoly on the fresh and processed potato market. Defendants maintain that there is no direct evidence of a conspiracy and that the sale of Rogers had the legitimate business objective of expanding production capacity in those markets.

The Plaintiffs' record in this matter contains statistical data on the relative present and potential market share of Ampco, Ampco's actions subsequent to the purchase of Rogers Foods in closing down processing facilities, and documentation indicating Alexander & Baldwin and Ampco were aware of the potential antitrust consequences prior to the acquisition of Rogers Foods. Thus, the Plaintiffs conclude that the purchase of Rogers Foods had the necessary and intended consequence of excluding Plaintiffs from entering the market as potential competitors. In *Helix Milling Co. v. Terminal Flour Mills Co.*, 523 F.2d 1317 (9th Cir. 1975), *cert. denied*, 423 U.S. 1053, 96 S.Ct. 782, 46 L.Ed.2d 642 (1976), the Ninth Circuit Court of Appeals found that plaintiff had alleged sufficient factual information regarding the defendant's actions in purchasing existing commercial facilities desired by the plaintiff from which a jury could find anticompetitive intent, thus allowing plaintiff to survive defendant's motion for summary judgment on that issue.

Therefore, the Court finds that the state of the record in this matter contains sufficient evidence to establish that there is a genuine issue of material fact regarding an antitrust type violation and, thus, Plaintiffs withstand the Defendants' challenge to the first part of the three-part standing test. It is conceivable to the Court that a jury could find an anticompetitive result or intent based upon Defendants' actions in selling and purchasing Rogers Foods.

The third part of the three-part test set forth by the Ninth Circuit requires that in order for the Plaintiffs to have standing, that Plaintiffs must show legal causation, i.e., that the injury caused was of the type

that the antitrust laws were intended to prevent. *California State Council v. Associated General*, 648 F.2d 527, 537 (9th Cir. 1980), *cert. granted*, —— U.S. ——, 102 S.Ct. 998, 71 L.Ed.2d 292 (1982). The Ninth Circuit has had recent occasion to construe the legal causation test in light of the decision of the United States Supreme Court in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), in *Ostrofe v. H. S. Crocker Co., Inc.*, 670 F.2d 1378 (9th Cir. 1982). In *Ostrofe*, the Ninth Circuit recognized that:

> The central theme of *Brunswick* [*Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)] is that to be actionable under Section 4, plaintiff's injury should fall within the core of Congressional concern underlying the substantive provision of the antitrust laws allegedly violated.

> *Id.* at 1387.

The movement of the Ninth Circuit towards this type of zone-of-interests approach to the legal causation aspect of standing was first recognized by that Court in *California State Council v. Associated General*, 648 F.2d 527 (9th Cir. 1980), *cert. granted*, —— U.S. ——, 102 S.Ct. 998, 71 L.Ed.2d 292 (1982), where the Court recognized that parties should still be permitted to litigate their claims if to do so would further the policies underlying the antitrust laws. Likewise, in *Ostrofe v. H. S. Crocker Co., Inc.*, at 1383 (9th Cir. March 8, 1982), the Court recognized that:

> The extent to which allowing a particular class of plaintiffs to bring suit for damages will further the enforcement purpose of Section 4 is an important factor in determining whether such plaintiffs should be allowed standing.

Applying this aspect of the test in conjunction with the finding of the Court relative to the first aspect of the test, the Court finds that, since the jury could find an anticompetitive result or intent from Defendants' actions, that anticompetitive result or intent is the type of injury the antitrust laws were intended to prevent and Plaintiffs' injury could flow from that

which makes the Defendants' acts unlawful. The Court further finds that allowing this class of plaintiffs to bring the suit for damages would further the enforcement purpose of Section 4 of the Clayton Act and Sections 1 and 2 of the Sherman Act. Thus, the Court finds that the Plaintiffs withstand the Defendants' challenge to the third aspect of the standing test.

The second part of the three-part standing inquiry requires the Court to consider whether there is a genuine issue of material fact regarding whether Plaintiffs have sustained injury to their business or property. Because Plaintiffs were not engaged in an existing enterprise at the time of the alleged antitrust violations, Plaintiffs clearly cannot claim a business injury. Additionally, it has been settled since the early stages of this litigation that Plaintiffs are not suing in their former capacities as directors, officers, and/or employees of Rogers Foods. The Plaintiffs are suing as prospective purchasers of a business.

In *Solinger v. A & M Records, Inc.*, 586 F.2d 1304 (9th Cir. 1978), *cert. denied*, 441 U.S. 908, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979), the Ninth Circuit recognized that the appropriate inquiry in this case is whether Plaintiffs took substantial demonstrative steps to enter an industry and were thwarted by the Defendants' alleged antitrust violations. The *Solinger* opinion further suggests that in considering whether the Plaintiffs in this case are prospective purchasers, that the District Court should consider the approach adopted in *Waldron v. British Petroleum Co.*, 231 F.Supp. 72 (S.D.N.Y.1964).

The *Waldron* Court recognized:

In determining whether a plaintiff has proved a requisite intention and preparedness, the courts have looked for *varying combinations* of the following typical elements:

1. The background and experience of plaintiff in his prospective business;

2. Affirmative action on the part of plaintiff to engage in the proposed business;

3. The ability of plaintiff to finance the business and the purchase of equipment and facilities necessary to engage in the business;

4. The consummation of contracts by plaintiff.

*Id.* at 81–82.

In determining whether the Plaintiffs have proved that they are prospective purchasers, the Court recognizes that the Plaintiffs satisfy the first two elements of consideration set forth in *Waldron*. However, the *Waldron* approach requires that the Court consider varying combinations of all four elements. Thus, the Court must determine to what extent, if any, the Plaintiffs satisfy the third and fourth elements of *Waldron* in determining whether Plaintiffs have proved sufficient factual causation between Defendants' actions and Plaintiffs' injury, to give them standing in this matter.

The issues of whether the Plaintiffs had the ability to finance the business and the purchase of the facilities necessary to engage in the business, and whether the Plaintiffs consummated contracts in this matter, are closely related. The Defendants argue that the Plaintiffs failed to consummate a contract for the purchase of Rogers Foods with Defendant Alexander & Baldwin and that the Plaintiffs' inability to consummate the contract of purchase was directly related to the Plaintiffs' inability to obtain the required financing for the purchase. The Court has reviewed the status of the record at the summary judgment stage and concludes that, as a matter of law, there is no genuine issue of material fact remaining that would allow the jury to find that a legal contract was executed by the Plaintiffs with Defendant Alexander & Baldwin for the purchase of Rogers Foods.

■ Plaintiffs assert that a contract was formed at the January 9, 1979, meeting when Plaintiffs allegedly accepted Alexander & Baldwin's offer of December 29, 1978. However, for that oral contract to exist there must be an offer and acceptance as to all material provisions of the agreement, and that the acceptance of that offer, to be

effectual, must be identical with the offer and unconditional and must not modify or introduce any new terms into the offer. An acceptance which varies from the terms of the offer is a rejection of the offer and is a counterproposition, which must in turn be accepted by the offeror in order to constitute a binding contract. *Phelps v. Good*, 15 Idaho 76, 96 P. 216 (1908); and *C. H. Leavell & Co. v. Grafe & Associates, Inc.*, 90 Idaho 502, 414 P.2d 873 (1966).

█ Plaintiffs contend that they accepted Defendant Alexander & Baldwin's offer of December 29, 1978, at the January 9, 1979, meeting. That offer can be construed in the light most favorable to Plaintiffs as being that Defendant Alexander & Baldwin offered to sell Rogers Foods to Plaintiffs for $13.5 million. However, at the January 9, 1979, meeting Plaintiff Bubar, chief negotiator for the Plaintiffs, asked for 120 days to consummate the deal. Bubar Deposition, p. 205 (May 27, 1981). Also at that meeting, Plaintiffs attempted to obtain a letter of intent from Alexander & Baldwin that "the management group [Plaintiffs] would be the only one with whom Alexander & Baldwin would be negotiating for whatever time period was agreed upon in the letter of intent." Nowatzki Deposition, p. 381 (September 28, 1981). Thus, as a matter of law, the Plaintiffs' alleged acceptance was not an acceptance as to all material provisions of the offer. Due to the attempted introduction of new terms into the offer, the acceptance was conditional and modified the terms of the original offer, and thus was not identical with the offer. Therefore, Plaintiffs' alleged acceptance was a rejection of the original offer and constituted a counterproposition. The Court agrees with the characterization of this situation by Plaintiff Bubar in his March 1979 declaration for the Department of Justice, in which he stated, "I and other members of management made an offer to purchase Rogers from Alexander & Baldwin, which had previously announced it was seeking offers."

Mr. Evans, chief negotiator for Alexander & Baldwin, also treated the introduction of these new terms regarding timing and exclusiveness, as a counterproposition and informed the Plaintiffs that he "had to contact Mr. Cox in Honolulu with the proposal" before accepting or rejecting that counterproposition. Smith Deposition, p. 113 (March 10, 1981). In the March 1979 declaration for the Department of Justice, Plaintiff Bubar stated, "Mr. Evans requested time to consider the offer. He refused the offer later that day stating as a reason that Alexander & Baldwin did not believe Rogers' management could obtain financing." In his deposition Plaintiff Bubar admitted that when Mr. Evans contacted him later that day, Mr. Evans said, "No deal." Bubar Deposition, p. 450 (July 31, 1981). Therefore, Alexander & Baldwin rejected the Plaintiffs' counterproposition negating the possibility of the creation of a binding contract.

The factual record before the Court further details the finding that there was no binding contract entered into between Plaintiffs and Defendant Alexander & Baldwin. When Plaintiff Bubar was asked during a deposition, "Would you have been willing on that day [January 9, 1979] to sign a written contract which was not conditioned upon your being able to obtain financing?", Mr. Bubar responded, "I guess on that day I could not have signed a contract without that condition." Bubar Deposition, p. 508 (July 31, 1981).

Mr. Edward Smith, a representative of the First Capital Corporation of Chicago, also present at the January 9, 1979, meeting, admitted that the Plaintiffs did not have financing available to accept Alexander & Baldwin's offer at that meeting. Smith Deposition, p. 141 (March 10, 1981). As of January 9, 1979, Plaintiffs had not executed any agreements with any financial institution to supply the capital necessary to purchase Rogers Foods. Those contractual and financial deficiencies are directly applicable to the third and fourth elements of the *Waldron* approach.

Thus, applying the factors set forth in *Waldron* and adopted by reference by the Ninth Circuit in the *Solinger* case, the

Court finds that there are no genuine issues of material fact remaining regarding whether or not Plaintiffs were prospective purchasers of Rogers Foods. Plaintiffs are unable to satisfy the requirements of Section 4 of the Clayton Act that they have been injured in their business or property by the Defendants. As a matter of law, the Plaintiffs are unable to prove factual causation between the alleged antitrust injury and the Defendants' actions in this case. The Plaintiffs were merely negotiating for the purchase of Rogers Foods with Alexander & Baldwin. Plaintiff Nowatzki correctly characterized the January 9, 1979, meeting as a "negotiating session." Nowatzki Deposition, p. 450 (September 29, 1981). Plaintiffs' expectations are insufficient to escalate to the legal status of a prospective purchaser under Section 4 of the Clayton Act. Since Plaintiffs fail to properly satisfy the second part of the standing test, they are without standing in this matter to sue for damages under the antitrust laws.

Defendants also argue that the Plaintiffs' breach of contract claim is barred by the statute of frauds since Plaintiffs' alleged contract for the sale of securities fails to comply with Idaho Code Section 28–8–319. Although the Court is disposed to agree with the Defendants' assertion, it is unnecessary to consider this aspect of the Defendants' Motion for summary judgment since the Court has found as a matter of law that no genuine issue of material fact remains by which a jury could find that a binding contract was entered into between the parties for the purchase of Rogers Foods.

Therefore, summary judgment is proper in this case because there are no genuine issues of material fact remaining regarding whether there was a binding contract between Plaintiffs and Defendant Alexander & Baldwin for the purchase of Rogers Foods. Since the Court has made that determination, it is unnecessary to pass upon the question of whether Plaintiffs' alleged contract claim is barred by the statute of frauds. Additionally, there are no genuine issues of material fact remaining regarding whether Plaintiffs have standing to sue under the antitrust laws of the United States.

Since Plaintiffs do not have standing to sue under those laws, as a matter of law, the Court need not consider the Defendants' allegations that there is no evidence of an antitrust conspiracy.

NOW, THEREFORE, IT IS ORDERED, That Defendants' Motions for summary judgment be, and the same are hereby, GRANTED.

IT IS FURTHER ORDERED, That each party to this action assume their own costs of this litigation.