752 F.2d 445
 1985-1 Trade Cases 66,387
 Ronald O. BUBAR, Donald J. Nowatzki, William M. Barth,
Charles W. Houpt, John J. Netterberg, and James F.
Palo, Plaintiffs-Appellants,
v.
AMPCO FOODS, INC., a California corporation; Alexander &
Baldwin, Inc., a Hawaii corporation; and Rogers
Foods, Inc., a Delaware corporation,
Defendants-Appellees.
 No. 82-3539.
 United States Court of Appeals,
Ninth Circuit.
 Argued April 8, 1983.
Submitted Nov. 7, 1983.
Decided Jan. 25, 1985.
 
 Thomas J. Greenan, Ferguson & Burdell, Seattle, Wash., for plaintiffs-appellants.
 Ronald E. McKinstry, Bogle & Gates, Seattle, Wash., Noble K. Gregory, Pillsbury, Madison & Sutro, San Francisco, Cal., for defendants-appellees.
 Appeal from the United States District Court for the District of Idaho.
 Before HUG, POOLE, and NORRIS, Circuit Judges.
 HUG, Circuit Judge:
 
 
 1
 This suit was brought for a breach of contract and also for treble damages for violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1 and 2 (1982). The district court, 539 F.Supp. 535 (1982), granted summary judgment on the contract claim on the ground that there had been no contract formed, and on the antitrust claims on the ground that the plaintiffs lacked standing. The plaintiffs appeal only the portion of the summary judgment denying the antitrust claims. Thus, the sole issue before us is whether the plaintiffs have standing to sue for treble damages under section 4 of the Clayton Act, 15 U.S.C. Sec. 15 (1982).
 
 FACTS
 
 2
 We conduct a de novo review of a summary judgment to determine if there is a genuine issue of material fact and, if not, whether the prevailing party is entitled to judgment as a matter of law. Chelson v. Oregonian Pub. Co., 715 F.2d 1368, 1370 (9th Cir.1983). In reviewing the evidence, we view it in the light most favorable to the losing party. Id. There had been considerable discovery prior to the motion for summary judgment, with depositions taken of all of the principal persons participating in the transactions. The testimony we refer to in relating the facts is taken from the depositions. Viewing the evidence in the light most favorable to the appellants, the record reveals the following: Plaintiffs Bubar, Nowatzki, Barth, Houpt, Netterberg, and Palo are former management employees of Rogers Foods, Inc., a corporation that processed potato, onion, and garlic products. Rogers Foods ("Rogers") was a wholly-owned subsidiary of Alexander & Baldwin, Inc. ("A & B"). Ampco Foods, Inc. ("Ampco") was a prime competitor of Rogers in the processed potato market in the Pacific Northwest.
 
 
 3
 In the summer of 1978, A & B decided to divest itself of certain holdings, including its subsidiary, Rogers. The plaintiffs, who were the top management of Rogers, ("the management group"), became interested in purchasing Rogers themselves, if financing could be obtained and if adequate terms of purchase could be obtained from A & B. In the early fall, they informed the A & B management of their desire to purchase and were informed that A & B would look favorably on the possibility of selling to the plaintiffs. The management group then began investigating possible sources of debt and equity capital.
 
 
 4
 In November of 1978, Ampco also became interested in purchasing Rogers, and met with A & B representatives to discuss a possible purchase. The course of negotiations between A & B and the two prospective purchasers may be summarized as follows: In mid-November, the management group made a proposal to acquire all the stock of Rogers for $10 million. A & B responded that the figure was too low, but that Rogers could be acquired for $15 million. On or about December 4, 1978, the management group proposed $12.5 million as the acquisition price for the stock. A & B responded that this was still too low.
 
 
 5
 On December 15, 1978, Ampco made a proposal to purchase the assets of only Roger's potato division for $10 million. This would leave A & B with the onion and garlic divisions. On December 28 or 29, after receiving this offer from Ampco, A & B telephoned the management group and proposed a sales price for Rogers of $13.5 million. At this time, all of the proposals were preliminary negotiations, with no firm offers having been made. A & B also had received expressions of interest from other prospective purchasers.
 
 
 6
 The management group was informed that representatives of A & B would be meeting with other prospective purchasers during the week of January 8, 1979. The management group agreed to meet with A & B on January 9, 1979.
 
 
 7
 During this period of negotiations, the management group had held discussions with several venture capital organizations, seeking their participation as equity investors, and also had held discussions with several banks concerning a line of credit for operating expenses. No firm commitments had been made.
 
 
 8
 On January 8, 1979, the prime movers of the management group, Bubar, the President, and Nowatzki, the Vice President for Finance, met with representatives of three venture capital organizations, First Capital Corporation of Chicago, Security Pacific Capital Corporation, and Seidler, Arnett and Spillane, with whom they previously had discussed this project. The purpose of the meeting was to develop the proposals to be discussed with A & B and to determine how the $13.5 million purchase price could be funded.
 
 
 9
 In previous discussions, A & B had indicated that it would accept certain of Rogers's assets as part payment. There was a receivable for flood damage worth $3.5 million and a sale and lease-back transaction with Lamb Weston, that would result in $6.2 million in cash. Thus, $9.7 million of the $13.5 million price could be paid by transferring these assets of Rogers to A & B. This left a balance of $3.8 million that the purchasers would have to provide. In his deposition, Bubar testified that it was contemplated that the money would be provided as follows: The members of the management group would invest $50,000 each, for a total of $300,000. First Capital and Security Pacific were to invest $2.7 million. The balance of $800,000, it was thought, could be obtained from a bank loan. In preliminary discussions with the equity investors, it was agreed that an $8 million line of credit with a bank would be required. Discussions had been held with several banks who had expressed interest, but no commitments had been made. At the January 8, 1979 meeting, it was proposed that perhaps $800,000 of this line of credit could be used to fund the balance of the purchase. Seidler, Arnett and Spillane's participation was to involve service rather than financial investment.
 
 
 10
 The lead equity investor was to be First Capital, which was represented by Edward Smith. At his deposition, Smith testified that it was contemplated that First Capital would invest $1.7 million and Security Pacific, $1.3 million. This would result in $3 million from the venture capital groups, an increase of $300,000 over the $2.7 million that Bubar had mentioned. However, Smith also testified that there was doubt about Security Pacific's participation because of the difficulty he had in working with Stevens, the representative of Security Pacific.
 
 
 11
 Smith also testified at his deposition that the manner in which the acquisition would be made would be to form a new corporation that would acquire either the assets or the stock of Rogers. The percentage of stock ownership each investor was to have and the voting control of the new corporation had not been determined, and the depositions revealed widely different expectations. The management group was to invest about one-tenth of the equity capital. It was not determined what percentage of the stock they would receive. Discussions with Smith, however, had indicated that they would initially receive at least ten percent, but might receive an additional ten to fifteen percent, either initially or to be earned by the management group over a period of time as additional compensation. Smith stated that because both First Capital and Security Pacific were Small Business Investment Companies and governed by certain banking regulations, it would be necessary to put the voting control in the hands of Seidler, Arnett and Spillane, either through the mechanism of a voting trust or through the issuance of voting and non-voting stock. Seidler, Arnett and Spillane were requesting two percent of the stock and $100,000 to perform this service. The management group was resistant to this idea, and to Seidler, Arnett and Spillane's participation, and had not as yet agreed to it.
 
 
 12
 On January 9, 1979, Bubar and Nowatzki from the management group and Smith from First Capital met with Evans of A & B to discuss the possible purchase. No representative from Security Pacific or Seidler, Arnett and Spillane was present. Bubar said his group would pay $13.5 million for Rogers, but asked for an additional 120 days to complete financial arrangements because the major portion of the equity capital was being provided by venture capital organizations. These organizations were required by their internal guidelines to send representatives to examine Rogers's books and substantiate the figures and present the investment proposal to their investment committees. When Evans replied that the time was too long, Smith stated that they would be able to make a decision in six weeks. Evans declined to give the group an exclusive status as the only party with whom A & B would negotiate during this period. At the end of the meeting, Evans informed the group that he would speak by phone with the president of A & B and get back to them later. No written agreements or letters of intent were signed and no oral commitments to buy or to sell were made.
 
 
 13
 Later that day, Evans met with representatives of Ampco. On that afternoon and during the course of the next two days, A & B agreed to sell the assets of the potato division to Ampco for $11,350,000. Evans so informed the management group. The onion and garlic divisions of Rogers were later sold to another organization.
 
 
 14
 On January 29, 1979, the Justice Department commenced an investigation of the transaction. A & B told Bubar, Nowatzki, and others in the management group to cooperate fully. They did so and met with Justice Department attorneys and provided statements and documents. The Justice Department announced on March 13, 1979 that it would not challenge the transaction. The sale to Ampco closed on March 15, 1979. The management group subsequently brought this action.
 
 
 15
 The district court determined that there was a genuine issue of material fact concerning the existence of violations of sections 1 and 2 of the Sherman Act by A & B and Ampco. There was evidence of the existence of a contract or conspiracy to monopolize or restrain trade in the potato processing market in the Pacific Northwest. The district court, however, granted summary judgment on the ground that these plaintiffs, the management group, did not have standing to bring a private treble damage action for injury resulting from the antitrust violation. Thus we are concerned in this appeal solely with the question of whether the plaintiffs, the management group, are proper parties to bring a private treble damage action.
 
 ANALYSIS
 
 16
 Section 4 of the Clayton Act allows recovery of treble damages by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. Sec. 15(a). Although the language of section 4 is very broad, Congress did not intend to provide a private remedy for all injuries that might conceivably be traced to an antitrust violation. Blue Shield of Virginia, Inc. v. McCready, 457 U.S. 465, 472-80, 102 S.Ct. 2540, 2545-49, 73 L.Ed.2d 149 (1982). Accordingly, the courts have limited the ability of injured parties to recover under the Clayton Act through the creation of restrictions on standing. This doctrine of antitrust standing requires an inquiry beyond that performed to determine standing in a constitutional sense. "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." Associated General Contractors v. California State Council of Carpenters, 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983). This determination of antitrust standing requires an evaluation of the plaintiff's harm, the alleged wrongdoing by the defendant, and the relationship between them. Id. 459 U.S. at 535, 103 S.Ct. at 907; Chelson v. Oregonian Pub. Company, 715 F.2d at 1370.
 
 
 17
 The Supreme Court likened the attempt to find a precise test of the limits of when a party injured in some way by an antitrust violation may recover treble damages in a private action to the struggle of judges to articulate a precise definition of the concept of proximate cause. The Court noted that various circuit court decisions had developed a "direct injury" test, a "target area" test, and a "zone of interest" test, but observed that "the infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case." Associated General Contractors, 459 U.S. at 536 & n. 33, 103 S.Ct. at 908 & n. 33. The Court cautioned that the use of these labels may lead to mechanical application and direct attention away from the policy factors which should govern the decision. The Court stated that the courts should analyze each situation in light of the policy factors discussed in its opinion.[1] The factors mentioned by the Court are:
 
 
 18
 (1) the nature of the plaintiff's alleged injury--whether it was the type the antitrust laws were intended to forestall,
 
 
 19
 (2) the directness of the injury,
 
 
 20
 (3) the speculative measure of the harm,
 
 
 21
 (4) the risk of duplicative recovery, and
 
 
 22
 (5) the complexity in apportioning damages.
 
 
 23
 459 U.S. at 538-45, 103 S.Ct. at 908-13.
 
 
 24
 It should be noted that a treble damage action is not the only way that an antitrust violation can be challenged. The Government can, of course, challenge the action but, in addition, private parties can bring equitable actions.[2]
 
 
 25
 It is apparent that determination of standing is a question of law, defining the limits to which private treble damage actions may be brought for injuries caused in fact by the violation of the antitrust laws. John Lenore & Co. v. Olympia Brewing Co., 550 F.2d 495, 498 (9th Cir.1977). This is to be distinguished from the questions of fact that a plaintiff would ultimately have to prove in order to establish his case, such as an antitrust violation, his injury, and the amount of damages. Once the plaintiff is found as a matter of law to be a proper plaintiff to bring the action or, in other words, to have antitrust standing, then the plaintiff can proceed to present the evidence on these questions of fact necessary to carry his burden of proof. The legal question at the outset is whether the plaintiff, even though he can show some injury caused in fact by an antitrust violation, has standing to bring a private treble damage action for this injury. Thus the courts must, on a case-by-case basis, define the legal limits of the remedy by applying the policy factors enumerated by the Supreme Court.
 
 
 26
 The plaintiffs in this case allege that they were potential competitors who were frozen out of the processed potato market by Ampco by a contract, combination, or conspiracy with A & B in violation of sections 1 and 2 of the Sherman Act. We assume the existence of the antitrust violations, because the district court found that genuine issues of material fact justify a trial on this issue.
 
 
 27
 There is no doubt that if the plaintiffs were existing competitors on the same level as Ampco, who were frozen out of a market by an antitrust violation, they would have standing to bring the treble damage action. It is the fact that they were not existing competitors at the time that creates the standing problem. The nature of the problem is well stated in 2 P. Areeda & D. Turner, Antitrust Law Sec. 335c, at 174:
 
 
 28
 Because it is as unlawful to prevent a person from engaging in a business as it is to drive him from it, the courts are sometimes faced by the plaintiff who is not "in" business but who claims that he would have been. The policy dilemma is clear. Antitrust policy seeks to compensate the person wrongfully excluded from the market with treble damages that punish the wrongdoer. On the other hand, the infinite universe of possible entrants and plaintiffs may seem unduly large; and the variety and force of other factors affecting one's actual entry and his subsequent prosperity make very speculative the connection between the defendant's violation and the plaintiff's claimed injury. (Footnote omitted.)
 
 
 29
 Although some courts have required that the plaintiff have an existing business or property interest, our circuit, along with most circuits, has held that a potential competitor has standing if he can show a genuine intent to enter the market and a preparedness to do so. Solinger v. A & M Records, Inc. [Solinger I], 586 F.2d 1304, 1309-10 (9th Cir.1978), cert. denied, 441 U.S. 908, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979); see Grip-Pak, Inc. v. Illinois Tool Works, Inc., 694 F.2d 466, 475 (7th Cir.1982), cert. denied, 461 U.S. 958, 103 S.Ct. 2430, 77 L.Ed.2d 1317 (1983).
 
 
 30
 In this case, there is no doubt that the plaintiffs intended to enter the market. The question is plaintiffs' preparedness to do so. Before we consider the issue of preparedness, we must first examine the question of whether the plaintiffs should be considered the potential competitor. Actually, the potential competitor was the corporation that the plaintiffs intended to form with the three venture capital organizations in which the plaintiffs were to be ten to twenty-five percent stockholders.
 
 POTENTIAL STOCKHOLDER
 
 31
 It generally has been held that a stockholder does not have standing to sue for damage to his stockholder interest because of an antitrust injury to the corporation. Solinger v. A & M Records, Inc. [Solinger II], 718 F.2d 298, 299 (9th Cir.1983); 2 P. Areeda & D. Turner, Antitrust Law Sec. 336d, at 180. The reasons for this are, first, that the injury is indirect. The corporation is the better plaintiff to bring the action. The relative damage to the stockholder is then resolved and remedied within the corporate structure. The diminution of stock value or dividends to the stockholder is remedied by a corporate recovery. Furthermore, it is the corporate claim and the corporate decision as to whether to bring suit, how to conduct it, and whether to settle it, as determined in the best interests of the corporation. This, of course, would be subject to a possible derivative suit if the directors breached their fiduciary duty in failing to pursue the claim. Moreover, the compexity of determining damages and the risk of duplicative recovery is significantly increased. There would be problems of determining the effect of various stock rights and the amount of the recovery that would flow through to the stockholders, either by increase in dividends or stock value. There would frequently be a multiplicity of plaintiffs and the difficulty of computing damages to a stockholder that would not become duplicative when other stockholders sued.
 
 
 32
 We must consider if these same considerations pertain when the plaintiffs are prospective stockholders in a corporation yet to be formed. In the situation of the prospective stockholder, we do not have a plaintiff in existence that can readily and more efficiently bring the action. Even so, we stated in Solinger II, 718 F.2d at 299, "A shareholder of a corporation injured by antitrust violations has no standing to sue in his or her own name, and, a fortiori, a prospective shareholder ordinarily would have no standing." We did not preclude all prospective shareholder actions, but noted that ordinarily that result would follow. Here, also, we need not determine whether, in every case, a potential stockholder in a corporation to be formed to compete in a market would lack standing. For example, a situation in which a person had all the resources to enter a market and intended to form a solely-owned corporation rather than an individual enterprise would involve different policy considerations and would not involve some of the standing problems enumerated above.
 
 
 33
 In this case the fact that the corporation had not been formed and that it had not been determined who all of the stockholders were to be, what the percentage of ownership was to be, what the stock rights were to be, and when or if additional stock was to be issued to the management group, magnifies the problems with regard to the complexity of damage calculations and the risk of duplicative recovery.
 
 
 34
 The management group sought to bring together several equity investors, who would form a corporation with it to acquire the assets of Rogers and compete in the processed potato market. No determinations of percentages of stock ownership were made. The plaintiffs expected to provide about ten percent of the equity capital requirements, although the amount was uncertain. They expected to receive somewhere between ten and twenty-five percent of the stock, according to Bubar. Some of the other members of the management group testified in their depositions that they expected the management group would receive larger percentages. It had been discussed that perhaps any amount over ten percent would be earned over a period of time. No determination had been made as to whether this would be done and, if so, whether it would be through stock options or stock bonuses, or over what period of time this was to take place. All of this would make it difficult to determine what portion of a corporate damage award would accrue to these potential stockholders. The participation of the venture capital group was in doubt, as will be discussed in the next section. Thus, the uncertainties involved in the fact that the corporation was not in existence and the eventual ownership of the stock unknown, would greatly increase the complexity of determining damages and the risk of duplicative recovery.
 
 
 35
 In summary, the policy reasons why a stockholder is not permitted standing to sue for antitrust injury to the corporation are, in this case, greatly magnified when we have as plaintiffs potential stockholders of some amount between ten and twenty-five percent of the shares seeking treble damages for injury to their potential stockholder interest in a corporation yet to be formed, where the relative rights of these and other stockholders have not been agreed to by the potential investors. For this reason alone, it would seem the management group members are not proper plaintiffs to bring a private treble damage action. This becomes even more apparent when we consider the stage of preparedness of the management group and others to enter the market as competitors.
 
 PREPAREDNESS
 
 36
 The grounds upon which the district court based its summary judgment was the lack of preparedness to enter the market because plaintiffs did not have a binding contract to acquire the assets they needed or the reasonable likelihood of producing the financial resources to do so. In Solinger I, 586 F.2d at 1310, we discussed some typical factors that the courts have considered in varying combinations to demonstrate intention and preparedness to enter the market. We enumerated these typical factors as follows:1. The background and experience of plaintiff in his prospective business,
 
 
 37
 2. Affirmative action on the part of plaintiff to engage in the proposed business,
 
 
 38
 3. The ability of plaintiff to finance the business and the purchase of equipment and facilities necessary to engage in the business, and
 
 
 39
 4. The consummation of contracts by plaintiff.
 
 
 40
 Id. Similar factors have been enumerated by other courts.[3]
 
 
 41
 All agree that the only way the management group could have become a competitor was to acquire Rogers or its assets. The first obstacle to establishing preparedness is that the management group did not have a binding contract to acquire the assets necessary to compete. The management group asserts that this should not be a factor because the contract that was necessary was to be made with one of the alleged antitrust conspirators. Yet, on the other hand, when our inquiry at this stage of the proceeding is one of standing, and one element is to determine how close the management group was to becoming a competitor, the lack of a contract to obtain the assets necessary to compete is surely a relevant factor, as the district court properly determined. Assume for a moment that the assets that the management group sought to acquire were owned by someone other than A & B, and that A & B and Ampco engaged in an antitrust violation by conspiring to restrain trade or monopolize through the sale of Rogers to Ampco. If the assets were to be acquired from the third party, there is no doubt that this would be a highly relevant factor and, for the purposes of the standing inquiry, we find it relevant here.
 
 
 42
 The second factor stressed by the district court is the lack of a showing of the financial resources to complete the purchase. The management group speaks as though it was a question of whether the management group ultimately could obtain loans to acquire Rogers. This mischaracterizes the situation. The management group intended to invest $300,000, which they had not as yet raised among their six members, as equity capital. It was incumbent that the balance of the necessary $3.8 million be obtained from the venture capital groups. There is no contention that the management group intended to borrow, or could have borrowed, the remaining $3.5 million to acquire the stock or assets of Rogers. These major equity participants had not committed themselves as potential purchasers. With this lack of a definite intent to become competitors, it is clear that these potential seventy-five to ninety percent stockholders in the corporation would not themselves have standing to bring this treble damage action. It would be a most peculiar result to hold that the potential ten to fifteen percent stockholders in the corporation do have standing to assert claims from the damages to the same potential corporation.
 
 
 43
 The management group contends that there is a genuine issue of fact as to whether they and the venture capital groups eventually could have agreed among themselves on the corporate structure and produced the required $3.8 million. However, there is no genuine issue of fact as to the state of their preparedness at the time of the alleged antitrust violation. Their status as prospective stockholders, the lack of commitment of the venture capital groups, and the other uncertainties are undisputed. We must determine from these facts whether as a matter of law the plaintiffs have standing to bring the action.
 
 POLICY FACTORS
 
 44
 We will summarize the standing considerations in light of the factors the Supreme Court has deemed important.
 
 
 45
 1. The nature of the plaintiff's alleged injury--whether it was the type of injury the antitrust laws were intended to forestall. If, in fact the plaintiffs were potential competitors prepared to enter the market and were frozen out of the market, this would be the type of injury the antitrust laws were intended to forestall. However, the corporation was the potential competitor and there was serious doubt as to its preparedness to enter the market.
 
 
 46
 2. Directness. These plaintiffs were potential ten to twenty-five percent stockholders in a corporation yet to be formed that was to be the competitor in the market. The injury would be to the corporation and only indirectly to the stockholders. The general rule that a stockholder may not sue for the antitrust damage to the corporation seems especially applicable in this case.
 
 
 47
 3. Speculative nature of the harm. Because the corporation was only a potential competitor, the speculative nature of the harm is increased because of the uncertainty that it would ever have been financially able to become a competitor. The speculative nature of the harm is further increased because the plaintiffs were only prospective minority shareholders in the corporation that was to be the competitor, and the distribution of the stock and of the relative stock rights was uncertain.
 
 
 48
 4. Complexity of apportioning damages and the risk of duplicative recovery. Because the percentage interest of the stockholders of the potential corporate competitor was uncertain, the assessment of damage to the stockholder interest of the management group would be complex and leave the possibility that other potential stockholders could claim damages to their stockholder interest. This would result in duplication of recovery--for example, if the management group claimed twenty-five percent interest in one suit and the remaining potential stockholders claimed a ninety percent interest. There would not, of course, be the same magnitude of problem as in some instances when the claims of injury are by persons at different levels and in different capacities in the economy. Here we would be seeking only to apportion among stockholders the damage suffered by a corporation. But the fact that the composition of the corporation was unknown, and the percentage of stockholdings and relative rights of the potential participants remained uncertain, would create very real problems in apportioning damages.
 
 OTHER PRECEDENT
 
 49
 The management group relies heavily upon our decision in Helix Milling Company v. Terminal Flour Mills Co., 523 F.2d 1317 (9th Cir.1975), cert. denied, 423 U.S. 1053, 96 S.Ct. 782, 46 L.Ed.2d 642 (1976). Helix was a competitor in the flour market in the Pacific Northwest. Its mill was destroyed by fire and it alleged that its only way of continuing in the milling and sales business was to acquire the assets of an existing mill in the Pacific Northwest. Helix approached General Foods with an offer to purchase its Pendleton, Oregon mill, which General Foods had indicated it desired to sell. Terminal Flour Mills, a major competitor in the market, approached General Foods and ultimately obtained a contract to purchase the mill. Helix filed an antitrust suit to enjoin the acquisition and for treble damages. We held that Helix had a viable claim for treble damages under section 1 of the Sherman Act. The question of standing was not raised, as such, in that case. Implicitly, however, we found standing.
 
 
 50
 The Helix case is superficially similar to this case in that Helix did not have a binding contract to purchase the mill. However, it varies in many other significant ways from this case. Helix was an existing competitor in the market, though temporarily disabled from competing. An actual offer had been made by Helix to acquire the mill and there was apparently no question raised about its financial ability to purchase the mill. This is in contrast to the present situation, in which no firm offer was made and financial ability was in doubt. Helix was the actual corporate competitor seeking reentry into the market, not a minority stockholder in a prospective corporate competitor seeking to enter. Nor were uncertainties of damage calculation or apportionment among stockholders present in Helix. The policy factors favoring Helix's standing as a proper plaintiff to bring a treble damage action are much more evident than in this case.
 
 CONCLUSION
 
 51
 Plaintiffs were potential minority stockholders in a corporation yet to be formed, which sought to enter the processed potato market. The venture capital groups who were to be the seventy-five to ninety percent stockholders had not determined whether they were going to invest in the project. Even with the prospective participation of the venture capital groups, another $500,000 to $800,000 would yet have to be raised, either by debt or additional equity financing, and there were no commitments for such financing. The plaintiffs never had a binding contract or commitment or option to acquire the assets necessary to enter the market. We agree with the district court that the plaintiffs in this posture did not have standing to bring this private treble damage antitrust action.
 
 
 52
 AFFIRMED.
 
 
 
 [1]
 For a discussion of the policy factors mentioned by the Supreme Court, see Ostrofe v. H.S. Crocker Co., Inc., 740 F.2d 739 (9th Cir.1984); Industrial Inv. Development Corp. v. Mitsui & Co., Ltd., 704 F.2d 785, 786 (5th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 393-94, 78 L.Ed.2d 337 (1983); Antitrust Standing After Associated General Contractors: The Issue of Employee Retaliatory Discharge, 63 Boston U.L.Rev. 983 (1983)
 
 
 [2]
 An equitable action to enjoin the activity can be brought under section 16 of the Clayton Act, 15 U.S.C. Sec. 26 (1982), which has standing requirements less stringent than those under section 4 of the Clayton Act. Equitable relief is available under section 16 of the Clayton Act to those with "threatened loss or damage" without the limitation that the injury be to "business or property," as required by section 4. 2 P. Areeda & D. Turner, Antitrust Law Sec. 335e (1978). Furthermore, there are no complex issues of damages or speculative or duplicative recovery problems. "[S]tanding to enjoin an antitrust violation is and should be more readily accorded than standing for treble damage purposes." Id. We need not decide whether the plaintiffs in this action would have had standing under section 16, because no such relief was sought
 
 
 [3]
 See Hecht v. Pro-Football, Inc., 570 F.2d 982, 994 (D.C.Cir.1977), cert. denied, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978), wherein the court stated:
 Indicia of preparedness must include adequate background and experience in the new field, sufficient financial capability to enter it, and the taking of actual and substantial affirmative steps toward entry, "such as the consummation of relevant contracts and procurement of necessary facilities and equipment." (Footnotes omitted.)