Charles H. LUCAS and Homer Bigbey, on behalf of themselves and all others similarly situated; and Local Union No. 640, IBEW, an unincorporated local organization, Plaintiffs/Appellants.

v.

BECHTEL CORPORATION; Bechtel Power Corporation; Brotherhood of Electrical Workers; Building and Construction Trades Department (AFL–CIO); International Association of Heat and Frost Insulators and Asbestos Workers; et al., Defendants/Appellees.

No. 85–1593.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 18, 1986.

Decided Sept. 19, 1986.

Michael P. Lehmann, Furth, Fahrner, Bluemle & Mason, San Francisco, Cal., for plaintiffs/appellants.

Mark Harrison, Harrison, Myers, Singer & Lerch, P.C., Phoenix, Ariz., and James P. Hargarten, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for defendants/appellees.

Before CHAMBERS, FARRIS, and BOOCHEVER, Circuit Judges.

BOOCHEVER, Circuit Judge:

Lucas and Bigbey, union electricians who worked on a construction project known as the Palo Verde Nuclear Generating Station (Palo Verde), and Local Union 640 of the International Brotherhood of Electrical Workers (Local 640) appeal from the judgment in favor of Bechtel Corporation (Bechtel), Bechtel Power Corporation (BPC), and several union defendants, including the International Brotherhood of Electrical Workers International (IBEW) and the Building and Construction Trades Department of the AFL–CIO (BCTD).

Lucas and Bigbey challenge the summary judgment granted by the district court with regard to their claim that the defendants violated the Sherman Act by conspiring and attempting to monopolize the design and construction of nuclear power plants. That summary judgment was predicated on a finding that these individual union electricians were not proper parties to assert the claim.

All plaintiffs challenge the directed verdict issued by the district court in favor of the defendants on the remaining labor claims at the conclusion of plaintiffs' presentation of its case-in-chief.[1] At issue are third-party beneficiary claims of Local 640 and some of its members under an agreement between Bechtel and the IBEW and questions concerning the IBEW International President's (President's) constitutional authority to execute multi-craft agreements without consent of local unions.

## FACTS

Bechtel is a national construction and engineering firm which hires union labor

---

[1] Plaintiffs also challenge several evidentiary and interlocutory rulings made by the district court during and before trial. Plaintiffs also challenge the district court's denial of class certification.

on a project-by-project basis pursuant to collective bargaining agreements, which historically have been with international, rather than local, unions. The BCTD is comprised of the IBEW and sixteen affiliated national and international construction trade unions, representing over four million workers. The IBEW, an international labor organization and an AFL–CIO affiliate, is comprised of approximately 1500 local unions, including Local 640 of Phoenix, Arizona, and approximately one million individual members.

This suit involves the IBEW International's constitution and three contracts: the Amended Specialty Agreement, the Inside Agreement, and the Stabilization Agreement. The Amended Specialty Agreement of 1969 between the IBEW and Bechtel is the successor of a 1958 national agreement. The Amended Specialty Agreement, which is subject to modification "at any time by mutual consent," makes certain terms of local collective bargaining agreements applicable to Bechtel projects undertaken within a local union's jurisdiction.

The local collective bargaining agreement applicable in Local 640's jurisdiction is the 1975–76 Inside Agreement, which sets out wages and other working conditions and requires signatory employers to contribute to Local 640 trust funds. The Inside Agreement was negotiated and entered into by the local chapter of the National Electrical Contractors Association (NECA). Although the Amended Specialty Agreement would make the Inside Agreement applicable to Bechtel, Bechtel was not a signatory to the Inside Agreement, and has never negotiated an agreement with Local 640.

The Stabilization Agreement of 1976 is the multi-craft project agreement negotiated by the BCTD on behalf of its affiliates to apply to work done at Palo Verde by various craftsmen. This agreement was signed by Bechtel, the BCTD, and its seventeen affiliates, including the IBEW. The agreement establishes wages, hours, and other working conditions at Palo Verde and declares that the agreement controls over any other conflicting union agreement. The travel and subsistence allowance received by Local 640's members under the Stabilization Agreement was less than they would have received under the Inside Agreement.

Article IV, § 3(12) of the IBEW constitution empowers the President to enter into agreements with other labor organizations, employer associations, or companies doing interstate business to cover the entire IBEW jurisdiction.[2] Article IV, § 3(13) of the IBEW constitution prohibits the President from entering into agreements which affect wages and other employment conditions when existing local agreements cover such employment without giving notice to and receiving consent from the local(s) affected.[3]

2. The provision states that the International President may:
    enter into, or authorize an I.V.P., representative or assistant to enter into, agreements with any national or international labor organization or association of employers, or with any company, corporation or firm doing an interstate, or inter-provincial business in electrical work, to cover the entire jurisdiction of the I.B.E.W.

3. The section provides as follows:
    The [International President] or his representatives shall not enter into agreements affecting wages, hours and conditions of employment where local union agreement, covering such employment already exists, without first notifying at least thirty (30) days in advance of such agreements, the local unions so con-

cerned or affected, in a district, and then only by procuring consent of a majority of the local unions in the district or the individual local union affected by this agreement.
    Article IV, section 3(13) was enacted by the 1962 IBEW convention and has not been formally amended, although in 1978, after this dispute arose, the IBEW Law Committee inserted the following annotation to section 3(13):
    When negotiating agreements with any national or international labor organization, or association of employers, or with any company, corporation or firm doing an inter-state, or inter-provincial business in electrical work, it is imperative that the I.P. have the authority to negotiate and enter into these agreements, or withdraw from these agreements, as circumstances so require.

In 1973, Arizona Public Service Company (APS) awarded the construction contract for Palo Verde to Bechtel contingent upon Bechtel's negotiation of a satisfactory multi-craft project agreement. If no project agreement were signed, APS had the option of awarding the contract to a non-union contractor.[4] The Stabilization Agreement was executed on May 17, 1976. Thereafter Lucas and Bigbey, and electricians from more than 300 IBEW locals worked at Palo Verde.

On June 8, 1976, Local 640 objected to the authority of the International President to execute such an agreement. It then filed a grievance pursuant to the Inside Agreement, and the NECA Joint Conference Committee found Bechtel guilty of violating that agreement. Bechtel did not participate, but instead prosecuted its grievances pursuant to the procedure under the Stabilization Agreement. The joint labor-management arbitral body specified by that agreement determined that the Stabilization Agreement is a valid collective bargaining agreement.

As a result, in 1977 Lucas and Bigbey filed a class action on behalf of all electricians subject to the jurisdiction of Local 640 against Bechtel and BPC.[5] The prior history of this complex litigation is summarized in the Appendix to this opinion. Briefly, Lucas and Bigbey claimed Bechtel and the union defendants violated the antitrust laws by conspiring to restrain trade in the labor market in order to monopolize the power plant construction market. The district court granted summary judgment for the defendants on this contention, holding that Lucas and Bigbey lacked standing to bring this claim. Local 640 joined Lucas and Bigbey in bringing several claims under section 301 of the Labor-Management Relations Act (LMRA), 29 U.S.C. § 185 (1982), for breach of contract by Bechtel and by the IBEW, and asked damages, declaratory relief, and enforcement of the NECA arbitral award.

Prior to trial, all parties filed cross motions for summary judgment on the labor law claims. Those motions were denied and this matter proceeded to trial. Following presentation of plaintiffs' case-in-chief, which consumed five trial days and included testimony of Lucas, Bigbey, and representatives of Local 640 and Bechtel, both the union defendants and Bechtel moved for a directed verdict. Both motions were granted.

The district court concluded that the IBEW had actual as well as apparent authority to enter into the Stabilization Agreement. Further, the court concluded that the IBEW's interpretation of its constitution as allowing the President to enter into long term multi-craft project agreements was not unreasonable or made in bad faith as a matter of law. The court held that Local 640 had not produced substantial evidence to support its claims. Finally, the district court concluded, as an independent ground to find for Bechtel, that the actions, representations, and past bargaining practices of the IBEW led Bechtel reasonably to believe the IBEW had authority to enter into the Stabilization Agreement and Bechtel justifiably relied on that belief; thus, no reasonable jury could find Bechtel liable.

**4.** Paragraph 8.3 of the construction contract provides:

In the event Bechtel or any of its subcontractors is or becomes a party to a collective bargaining agreement which pertains to the Work, Bechtel, after consultation with APS, shall negotiate and enter into a Project Labor Agreement with the union or unions involved in form and substance satisfactory to APS, which shall prevail over any such collective bargaining agreement. Such Project Labor Agreement shall incorporate such terms and conditions as are necessary or desirable to eliminate delays or work stoppages and exces-

sive labor costs, including without limitation, featherbedding, makework, production limiting, inefficient or uneconomic work practices, slowdowns, strikes, picketing, handbilling, jurisdictional disputes, or any other labor difficulties which would impede the progress of the Work or increase the cost thereof, so as to enable Bechtel and its subcontractors to efficiently and economically utilize labor forces for the duration of the Work.

**5.** BPC is a subsidiary of Bechtel and both will be referred to hereafter as "Bechtel."

## DISCUSSION

### I. Proper Parties to Bring Antitrust Claims

The district court's judgment on the antitrust claims was based on the lack of standing of the plaintiffs, Lucas and Bigbey.[6] The court held that they could not prove they suffered a direct injury resulting from a lessening of competition in the target area, the market for the design and construction of nuclear power plants. Lucas and Bigbey claim that *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739 (9th Cir.1984), *cert. dismissed*, 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985), controls and requires us to reverse the summary judgment. Bechtel contends that *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), supports the propriety of the summary judgment.

We review summary judgments *de novo. Golden v. Faust*, 766 F.2d 1339, 1340 (9th Cir.1985). Summary procedures in antitrust litigation should be used sparingly, at least where motive and intent are important factors, *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), and the "moving party is subject to a 'particularly rigorous' burden in antitrust cases." *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir.1983) (quoting *Mutual Fund Investors, Inc. v. Putnam Management Co.*, 553 F.2d 620, 624 (9th Cir.1977)). Nevertheless, we will not squander judicial resources by "requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint." *First National Bank of America v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968).

### A. Clayton Act Section 4

Lucas and Bigbey sought relief under sections 4 and 16 of the Clayton Act. Section 4 allows recovery of treble damages by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a) (1982). Read literally, this provision "could afford relief to all persons whose injuries are causally related to an antitrust violation. Recognizing the nearly limitless possibilities of such an interpretation, however, the judiciary quickly brushed aside this construction." *In re Multidistrict Vehicle Air Pollution*, 481 F.2d 122, 125 (9th Cir.), *cert. denied*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973). As we recently explained, "[a]lthough the language of section 4 is very broad, Congress did not intend to provide a private remedy for all injuries that might conceivably be traced to an antitrust violation." *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 448 (9th Cir.) (citing *Blue Shield of Virginia, Inc. v. McCready*, 457 U.S. 465, 472–80, 102 S.Ct. 2540, 2544–49, 73 L.Ed.2d 149 (1982)), *cert. denied*, — U.S. —, 105 S.Ct. 3481, 87 L.Ed.2d 616 (1985).

This unwillingness to recognize every actual or threatened economic loss attributed to an antitrust violation is consistent with the fundamental principle that the antitrust laws protect competition as a whole, not individual competitors. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *see also Alaska Teamsters Local 959 v. Atlantic Richfield Co.*, 616 F.Supp. 593, 597 (D.Alaska 1985).

Accordingly, the courts have limited the ability of injured parties to recover under the Clayton Act through the creation of restrictions on standing. This doctrine of antitrust standing requires an inquiry beyond that performed to determine

---

**6.** As noted in *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1469–70 n. 2 (9th Cir.1985), "What courts have referred to as antitrust standing is, however, subsumed within the inquiry into whether a plaintiff is a proper party to bring an antitrust action" (citing *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983)).

standing in a constitutional sense. "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983). *Bubar*, 752 F.2d at 448. In making this determination, "the infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case." *Associated General Contractors*, 459 U.S. at 536, 103 S.Ct. at 907. Instead, "previously decided cases identify factors that circumscribe and guide the exercise of judgment in deciding whether the law affords a remedy in specific circumstances." *Id.* at 537, 103 S.Ct. at 908. The factors identified by the Supreme Court are: (1) whether the plaintiff's alleged injury is the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; and (4) keeping the scope of complex antitrust trials within judicially manageable limits. *Id.* at 538–45, 103 S.Ct. at 908–12.

The first factor is of "tremendous significance." *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1470 n. 3 (9th Cir.1985). "The requirement that the alleged injury be related to anticompetitive behavior requires, as a corollary, that the injured party be a participant in the same market as the alleged malefactors." *Id.* at 1470 (citing *Associated General Contractors*, 459 U.S. at 538, 539, 103 S.Ct. at 909). It is conceded by Lucas and Bigbey that they were neither Bechtel's competitors nor consumers in the market for the design and construction of nuclear power plants. Thus, this factor weighs heavily against them, although they contend that the defendants engaged in an intentional secondary conspiracy to depress wages in the electrician

labor market in order to effect the primary conspiracy, and that they are participants in this market. But the Supreme Court in *Associated General Contractors* found that injury arising from an analogous labor situation was tenuous because it was not clear whether the plaintiffs' interests "would be served or disserved by enhanced competition in the market." 459 U.S. at 539, 103 S.Ct. at 909. In *Associated General Contractors*, the Court denied standing to a union that alleged the defendant association of building and construction contractors conspired to restrain the union's business activities by coercing general contractors, landowners, and others to deal with nonunion contractors. The Court stated that although the anticompetitive conduct was directed at certain third-parties, the union had not been injured in its business or property since it was neither a consumer nor a competitor in the restrained market, and because there was no nexus between the quality of competition in the target area and the welfare of the union. *Id.* at 527–29, 538–39, 103 S.Ct. at 902–04, 908–09.

The second factor, the directness of the injury, also weighs heavily against finding that Lucas and Bigbey are the proper parties to bring suit. Here, as in *Associated General Contractors*, the chain of causation (between their injury and the alleged restraint in the market for nuclear plant construction) "contains several somewhat vaguely defined links." *Id.* at 540, 103 S.Ct. at 909. Lucas and Bigbey allege that the Stabilization Agreement was intended to restrain trade by imposing low wages for electricians, in furtherance of the larger conspiracy to monopolize the market for nuclear plant construction. Their claimed injury derives from the depressed wages.[7] Moreover, Bechtel's competitors are much more immediate victims of the alleged conspiracy, and an action by them "would encounter none of the conceptual difficulties that encumber the [plaintiffs'] claim." *Id.* at 541–42, 103 S.Ct. at 910–11. "The exist-

---

7. Lucas' and Bigbey's claims actually involve loss of travel and subsistence allowances as well as loss of wages. For purposes of simplicity, we use only the term "wages" in this opinion.

ence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as the [plaintiffs] to perform the office of a private attorney general." *Id.* at 542, 103 S.Ct. at 910. Bechtel's competitors are such an identifiable class with the requisite motivation. Finally, the Court noted that the "indirectness of the alleged injury also implicates the strong interest ... in keeping the scope of complex antitrust trials within judicially manageable limits." *Id.* at 543, 103 S.Ct. at 911.

The third *Associated General Contractors* factor, the speculative nature of the harm, also strongly supports the district court's decision. The Court in *Associated General Contractors* focused on the nature of the union's injury, *id.* at 538, 103 S.Ct. at 908, and noted that increased competition among employers for projects tends to depress wages. *Id.* at 539 & n. 41, 103 S.Ct. at 909 & n. 41. That applies here as well. As the Supreme Court explained, "uninhibited competition among employers striving to reduce costs in order to obtain a competitive advantage over their rivals," *id.* at 539, 103 S.Ct. at 909, may actually work against the goals of organized labor, particularly if one method of reducing costs is the use of a non-union labor force. Thus, the Stabilization Agreement may have preserved union jobs, because it is contended that, without that agreement, the Arizona Public Services Company would have awarded the contract to a non-union employer.

As a fourth factor, the Supreme Court has identified "the strong interest ... in keeping the scope of complex antitrust trials within judicially manageable limits." *Id.* at 543, 103 S.Ct. at 911. This factor may be analyzed in one of several ways— "the importance of avoiding either the risk

of duplicative recoveries ... or the danger of complex apportionment of damages." *Id.* at 534–44, 103 S.Ct. at 906–12. We do not find the same kinds of risk of duplicative recoveries or complex apportionment of damages in the present case as those discussed in *Associated General Contractors.* *See id.* at 544, 103 S.Ct. at 911 (*e.g., Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) (refusing to allow defendants to discount plaintiffs' damages claim to the extent that overcharges were passed on to plaintiffs' customers); *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (potential plaintiffs at each level of distribution chain asserting conflicting claims to common fund)).

Of course, "the Supreme Court did not explicitly state that a plaintiff must satisfy all of the *Associated General Contractors* factors, or, indeed, any particular factor." *Bhan,* 772 F.2d at 1470 n. 3. Even so, this case also implicates the goal of keeping complex antitrust suits within judicially manageable limits. As previously discussed, Lucas and Bigbey claim they were injured by illegally depressed wages as a consequence of the conspiracy to restrain trade by imposing artificially low wages for electricians. But this alleged conspiracy is secondary to the alleged conspiracy to monopolize interstate commerce in the design and construction of nuclear power plants. Therefore, Lucas and Bigbey assert claims for higher wages as employees of the union with whom Bechtel contracted. On the other hand, it is Bechtel's competitors who would have the direct claim to antitrust damages. The direct and indirect claims are not duplicative in the sense of asserting conflicting claims to a common fund; nevertheless, the determination and proof of these damages would be very complex.[8] We hold in any event that

---

8. For example, if Bechtel had not successfully negotiated the Stabilization Agreement and one of its competitors had been awarded the Palo Verde project, the competitor presumably would have paid its electricians at wage rates lower than those that Lucas and Bigbey would

have received without the operation of the Stabilization Agreement. In all probability, that would have been necessary for the competitor to secure the award. Whether the electricians' wages would have been higher than those under the Stabilization Agreement is conjectural. To

"[a]lthough the policy against duplicative recoveries may not apply to the ... type of harm asserted in [the plaintiff's] brief ... the remote and obviously speculative character of that harm is plainly sufficient to place it beyond the reach of § 4." *Associated General Contractors*, 459 U.S. at 545 n. 52, 103 S.Ct. at 912 n. 52.

■ Thus, all of the four factors of *Associated General Contractors* support the holding that Lucas and Bigbey are not proper parties to bring this suit. Lucas and Bigbey claim that *Associated General Contractors* is inapposite. Instead, they rely on *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739 (9th Cir.1984), *cert. dismissed*, 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985).[9] In *Ostrofe*, a former employee of an alleged co-conspirator alleged that he was *discharged* and *boycotted* from further employment in the target industry because he had refused to participate in a necessary step in a conspiracy to reduce price competition. We granted standing because (1) the injury was directly caused by an intentional boycott which stemmed from a violation of antitrust policy; (2) the injury was of a type antitrust laws were intended to prevent; and (3) as an immediate victim of the antitrust violation, Ostrofe was its natural vindicator. *Id.* at 742–43. We cannot find that Lucas' and Bigbey's alleged injuries were directly caused by an intentional boycott; their in-

juries were not "an integral and inextricable part of the anticompetitive scheme." *Id.* at 746. As noted above, Lucas and Bigbey are not the natural vindicators of the claimed antitrust violation; denying them standing "is not likely to leave a significant antitrust violation undetected or unremedied." *Associated General Contractors*, 459 U.S. at 542, 103 S.Ct. at 910. Thus, Lucas and Bigbey are not the proper parties to assert the antitrust claims under section 4.

## B. Clayton Act Section 16

Lucas and Bigbey also seek injunctive relief under section 16 of the Clayton Act. That section provides in part:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon ... a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue....

the extent that the competitor would pay higher wages, its profits (*i.e.* its damages) would be reduced. Thus, in a sense, Lucas' and Bigbey's claim to higher wages is in conflict with a hypothetical competitor's claim to loss of profits. We need not resolve this hypothetical problem, however, for we find that where Lucas' and Bigbey's injury is not the type that the antitrust laws were intended to forestall, where their injury is so indirect and their harm so speculative, there can be no question that permitting their claim would severely strain the goal of keeping complex antitrust suits within judicially manageable limits.

9. They also argue that *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), supports their position. In *McCready*, the Supreme Court granted standing to a health insurance purchaser who alleged that her insurance carrier had conspired with psychiatrists to exclude psychologists from par-

ticipating in the policy's coverage. As a result, McCready had to pay for her psychologist's services separately. Although McCready was not the "target" of the anticompetitive scheme, the Court found that she was within that area of the economy endangered by the anticompetitive conduct, and that her injury was "inextricably intertwined with the injury the conspirators sought to inflict on psychologists...." *Id.* at 484, 102 S.Ct. at 2551.

In *Associated General Contractors*, the Court stressed that McCready was a consumer of psychotherapeutic services, that she had been injured by defendants' conspiracy to restrain competition in the market for such services, and that her injury was of a type Congress sought to redress in providing a private remedy for violations of the antitrust laws. 459 U.S. at 538, 103 S.Ct. at 908. Thus, *McCready* does not lend much support, especially in light of the later-decided *Associated General Contractors*.

15 U.S.C. § 26 (1982). We have recognized that the standing requirements under this section are "less stringent" than those under section 4. *Bubar*, 752 F.2d at 449 n. 2; *Lucas v. Bechtel Corp.*, 633 F.2d 757, 760 (9th Cir.1980) (*Lucas I*); *see also Parks v. Watson*, 716 F.2d 646, 662 (9th Cir.1983). Because plaintiffs under section 16 are not seeking treble damages but only equitable relief, and because no complex issues of damages or speculative or duplicative recovery problems arise, all that is required is a showing of "a threatened loss or injury cognizable in equity proximately resulting from the alleged antitrust violation." *Parks*, 716 F.2d at 662 (citing *City of Rohnert Park v. Harris*, 601 F.2d 1040, 1044 (9th Cir.1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980)). Injury need not be to "business or property" nor within the "target area" of the alleged anticompetitive conduct. *Id. See also* 2 P. Areeda & D. Turner, *Antitrust Law* § 335e (1978). Lucas and Bigbey have alleged that they have suffered the continuing loss of benefits of the Inside Agreement as a proximate result of the anticompetitive conduct of defendants.

The district court did not specifically address this section 16 contention, but there is enough evidence in the record for us to review its ultimate holding of lack of standing. Even assuming that Lucas' and Bigbey's injury was proximately caused by the alleged antitrust violation, we must still be able to find that their injury is cognizable in equity. This we are unable to do.

Section 16 provides injunctive relief "under the same principles as generally applied by courts of equity." *American Passage Media Corp. v. Cass Communications, Inc.*, 750 F.2d 1470, 1472 (9th Cir.1985). Traditional equitable criteria require the plaintiff to show "either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in its favor." *Apple Computer, Inc. v. Formula International Inc.*, 725 F.2d 521, 523 (9th Cir.1984). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.... Under any formulation of the test, plaintiff must demonstrate that there exists a significant threat of irreparable injury." *Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1376 (9th Cir.1985) (citing *American Passage*, 750 F.2d at 1473).

The injury alleged is the loss of monetary benefits claimed under the Inside Agreement. Nowhere do Lucas and Bigbey claim "irreparable harm." Their complaint and depositions indicate that diminution of wages is their sole injury. Even if we accept Lucas' and Bigbey's contention that the loss includes hourly wages in addition to travel and subsistence pay, the injury involves only monetary harm. "Monetary damages are not usually sufficient to establish irreparable harm." *American Passage*, 750 F.2d at 1473–74. Lucas and Bigbey make no other supportable claim of injury cognizable in equity and therefore lack standing under section 16.[10] It is thus unnecessary to decide whether they are likely to succeed on the merits. *Oakland Tribune*, 762 F.2d at 1376. Although the district court did not base its decision on this specific point, we may affirm on any ground finding support in the record. *Islamic Republic of Iran v. Boeing Co.*, 771 F.2d 1279, 1288 (9th Cir.1985).

## II. Directed Verdict on Labor Claims

The labor claims under section 301 of the LMRA primarily allege breach of contract by Bechtel and the union defendants. Lucas and Bigbey sued to vindicate their "uniquely personal" rights to the wages

---

**10.** In their Memorandum of Points and Authorities in Opposition to Defendants' Motion for Partial Summary Judgment, Lucas and Bigbey cite a "review" undertaken by the BCTD that indicates the Stabilization Agreement alters certain contractual provisions contained in the Inside Agreement. These provisions relate to such matters as grievance procedures, crew sizes, selection of foremen, and several wage issues. Nowhere do Lucas and Bigbey claim they were injured by any provisions but those affecting pay.

claimed under the allegedly breached agreements, *see Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 562, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231 (1976), and Local 640 invoked an interest on behalf of its members to recover wages claimed under a collective bargaining agreement (the Inside Agreement). *See International Union v. Hoosier Cardinal Corp.*, 383 U.S. 696, 699–700, 86 S.Ct. 1107, 1109–10, 16 L.Ed.2d 192 (1966); *see also Lucas I*, 633 F.2d at 759–60. The district court denied defendants' motions for summary judgment. At the close of plaintiffs' case, however, the court granted Bechtel's and the union defendants' motions for directed verdicts. It held that the IBEW's interpretation of its constitution as not prohibiting the IBEW President from entering into the Stabilization Agreement was reasonable, the President had apparent authority to execute the agreement, and Bechtel reasonably relied on that authority.

### A. Third-Party Beneficiary Theory

The defendants argue that Bechtel and the IBEW, the parties to the Amended Specialty Agreement, had expressly reserved the right to modify the agreement, and that the Stabilization Agreement constitutes such a permissible modification. Local 640 contends that, while it was not a signatory to the Amended Specialty Agreement, no modification could occur without its consent because it was an intended beneficiary of that agreement and its rights under it had vested in the early 1970's when its members worked for Bechtel on other projects.

The defendants respond that the parties to the Amended Specialty Agreement did not intend to make Local 640 a third-party beneficiary of that agreement, third-party beneficiary principles have no application in a labor law context, and the agreement gave the signatories the right to modify. The district court did not reach the latter issues, but held, prior to trial, that Local 640 was not an intended beneficiary of the Amended Specialty Agreement. The district court did not otherwise explain the

basis for its decision, but we need not remand for further explanation and findings.

■ We assume without deciding that third-party beneficiary principles apply here, and we also accept for purposes of this appeal that the signatories intended Local 640 to be a beneficiary. Even under these assumptions, however, Local 640 cannot prevent the modification of the Amended Specialty Agreement because the agreement expressly reserved to the signatories, Bechtel and the IBEW, the right to modify at any time by mutual consent. Principles of contract interpretation are legal issues subject to our *de novo* interpretation. *Kemmis v. McGoldrick*, 767 F.2d 594, 597 (9th Cir.1985). One established principle is that the "rights of a third-party beneficiary are limited by the contract between the promisor and the promisee." *Punikaia v. Clark*, 720 F.2d 564, 570 (9th Cir.1983) (citing 4 A. Corbin, *Contracts* §§ 810, 818 (1951); 2 S. Williston, *Contracts* § 364A (3d ed. 1959)), *cert. denied*, 469 U.S. 816, 105 S.Ct. 83, 83 L.Ed.2d 30 (1984); *see also Montana Bank of Circle, N.A. v. United States*, 7 Cl.Ct. 601 (1985). In *Punikaia*, the parties intended the state's obligation to maintain a leprosarium would expire in twenty-one years. 720 F.2d at 570. Thus, at the end of that time patients who were third-party beneficiaries had no further rights under the agreement. In *Montana Bank*, a bank's claims as third-party beneficiary were rejected because the signatories of the contract had "expressly provided that the contract could be terminated by mutual agreement of [the signatories]. This power was reserved expressly and could be exercised by [the signatories] without regard to its effect on Bank as a third party beneficiary." 7 Cl.Ct. at 611.

Here the parties to the Amended Specialty Agreement intended that its provisions were subject to modification when agreed to by the parties. "[T]hird-party beneficiaries cannot exercise rights that the parties did not intend them to have." *Punikaia*, 720 F.2d at 570. Local 640, by accepting the benefits of the Amended Specialty Agreement, also accepted the limitations of

the contract. *See Trans-Bay Engineers & Builders, Inc. v. Hills,* 551 F.2d 370, 378 (D.C.Cir.1976).

Local 640 contends that its rights under the Specialty Agreement were vested once it engaged in work for Bechtel on other contracts. Assuming that rights were vested for the purpose of those contracts, there were no vested rights acquired for the Palo Verde project because the Specialty Agreement provided for modification. The Stabilization Agreement constituted such a modification. Local 640 was well aware of the changed terms included in the Stabilization Agreement before any of its members accepted employment at Palo Verde.

We conclude that no third-party beneficiary rights of Local 640 were violated. We must next consider whether, by modifying that agreement through the execution of the Stabilization Agreement, the IBEW breached any other contract rights with Local 640 or whether, under its constitution, the IBEW lacked authority to enter into the Stabilization Agreement.

### B. IBEW Authority

#### 1. Evidentiary Ruling

■ Before the district court directed a verdict in the defendants' favor, it made several procedural rulings and excluded certain evidence offered by plaintiffs.[11] Most significantly, the court refused to admit testimony offered to impeach the official minutes of the 1974 and 1978 IBEW International conventions; the minutes show that the delegates defeated Local 640's efforts to curtail the International President's authority to enter into multicraft project agreements, and confirmed his authority to bind local unions to such agreements. Plaintiffs, in a footnote, ask us to reverse. "Our review of rulings on evidence is limited to abuse of discretion, even in the context of appeals from a directed verdict." *M.A.P. Oil Co. v. Texaco*

*Inc.,* 691 F.2d 1303, 1310 (9th Cir.1982); *see also Clady v. County of Los Angeles,* 770 F.2d 1421, 1433 (9th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1516, 89 L.Ed.2d 915 (1986). We find no abuse of discretion. Our review of the record suggests that any probative value of such impeaching testimony was substantially outweighed by dangers of confusing the issues and misleading the jury, and considerations of waste of time. *See* Fed.R.Evid. 403. Generally, official minutes of meetings are considered the best evidence of business transacted, *see Farber v. Servan Land Co.,* 662 F.2d 371, 379 (5th Cir.1981) (corporate minutes), and plaintiffs' proffered testimony would only contend the delegates' votes were incorrectly polled. This collateral attack would have little or no probative value.

#### 2. Directed Verdict for IBEW

Plaintiffs argued that the IBEW constitution did not give the International President authority to enter into multi-craft project agreements and that the execution of the Stabilization Agreement constituted a breach of contract. At the conclusion of plaintiffs' case-in-chief, the district court granted defendants' motion for a directed verdict. Holding that the interpretation of the IBEW constitution was a question of contract interpretation, treated as a matter of law, the court found that the constitution gave both apparent and actual authority to the President. The court also held that federal courts should not interfere with union officials' interpretation of their constitution unless that interpretation is unreasonable or in bad faith and that, even if the issue were not one of law, the plaintiffs had failed to adduce "substantial evidence that could support a finding, by reasonable jurors, that defendant IBEW's interpretation of its Constitution was unreasonable or in bad faith."

11. Prior to trial, the district court decided two questions of law regarding the damages plaintiffs could seek at trial. First, the court held that plaintiffs could not seek punitive damages on their section 301 claims. Second, the Court ruled that because plaintiffs had not complied with the local rule requiring detailed itemization of damages, they could not recover for Bechtel's alleged failure to make payments into two local union trust funds. The court also excluded as inadmissible hearsay notes of a Bechtel manager.

A directed verdict is appropriate where "the evidence permits only one reasonable conclusion as to the verdict.... It is inappropriate if there is substantial evidence to support a verdict for the non-moving party.... We consider all of the evidence in the light most favorable to the non-moving party...." *Peterson v. Kennedy,* 771 F.2d 1244, 1256 (9th Cir.1985) (citations omitted), *cert. denied,* — U.S. ——, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986). Nevertheless, the non-moving party must offer "substantial" evidence, that is, "more than a mere scintilla." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938).

We consider the directed verdict in the context of federal law and national labor policy: "The dimensions of § 301 require the conclusion that substantive principles of federal labor law must be paramount ... [and] issues raised in suits of a kind covered by § 301 [are] to be decided according to the precepts of federal labor policy." *Local 174, Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 103, 82 S.Ct. 571, 576, 7 L.Ed.2d 593 (1962). Two precepts guide our decision in this internal union dispute. One is that "judicial interference [in intra-union affairs] should be undertaken only with great reluctance." *Stelling v. IBEW,* 587 F.2d 1379, 1387 (9th Cir.1978), *cert. denied,* 442 U.S. 944, 99 S.Ct. 2890, 61 L.Ed.2d 315 (1979). A related precept is that when "union officials have offered a reasonable construction of the constitution, and no bad faith on their part has been shown, the courts should not disturb the union officials' interpretation." *Id.* at 1389; *see also Busch v. Givens,* 627 F.2d 978, 981 (9th Cir.1980). Viewing the record with these precepts in mind, we agree that the plaintiffs failed to carry their burden of producing substantial evidence to support their contentions.

■ The controversy before us is a legal one: was the IBEW's interpretation that the President had authority under the IBEW constitution to sign a project agreement reasonable and made in good faith? We must decide whether, "[v]iewing the

constitution as a whole, ... 'there was arguable authority for the officer's act from the officer's viewpoint at the time, not from a court's more sophisticated hindsight.' " *Stelling,* 587 F.2d at 1388, 1389 n. 10 (quoting Leslie, *Federal Courts and Union Fiduciaries,* 76 Colum.L.Rev. 1314, 1319 (1976)).

Our starting points are sections 3(12) and (13) of Article IV of the IBEW constitution. Section 3(12) grants wide authority to the International President to enter into national agreements, but section 3(13) prohibits the President from entering into agreements where a local agreement already exists, without the consent of the local. Because of uncertainty whether a "local agreement" as envisioned by section 3(13) existed between Local 640 and Bechtel for the Palo Verde project, we must look beyond the literal reading to determine the parties' intent. There was evidence that section 3(13) was not intended to address multi-craft project agreements but rather single-craft international agreements with major individual employers. Additionally, present and former IBEW officers testified that project agreements were not within the scope of section 3(13). Multi-craft agreements are negotiated by the BCTD on behalf of the affiliated international unions. It is not feasible for such agreements to be subject to the veto of every local.

The actual and apparent authority of the President is bolstered by other provisions of the IBEW constitution and past practice. Article IV grants broad power to the President to carry out the objectives of the IBEW, which include securing employment. Article XV gives the President "the right and power to divide or change the territory or jurisdiction covered by any [local union], or to take charge of and direct certain jobs or projects in or passing through any territory, when in the judgment of the [International President] such should be done." IBEW witnesses testified that the President had previously executed several multi-craft project agreements binding local unions. The debate at the 1974 IBEW International Convention concerning whether

the International President's power to enter into multi-craft project agreements should be curtailed indicates that the delegates assumed the President did have that power. This assumption adds to the President's apparent authority, and the fact that the delegates rejected any restrictions on that power adds to the actual authority.

Further, "the overriding authority of the president of this international has been recognized judicially, adding credence to the [defendants'] interpretation." *Stelling,* 587 F.2d at 1389. Both this circuit, *see id.,* and the Fourth Circuit, *see Parks v. IBEW,* 314 F.2d 886 (4th Cir.), *cert. denied,* 372 U.S. 976, 83 S.Ct. 1111, 10 L.Ed.2d 142 (1963), have concluded after reviewing the structure and constitution of the IBEW that "effective control of IBEW activities is entrusted to the [International President].... He is empowered ... to enter into agreements with national or international labor organizations or associations of employers." 314 F.2d at 893. These cases suggest the President has actual authority and strengthen the IBEW's argument that its interpretation is reasonable.

Local 640 relies on our decision in *Parish v. Legion,* 450 F.2d 821, 827 (9th Cir.1971), and a note in *Stelling* referring to the *Parish* holding, 587 F.2d at 1389 n. 11, for the proposition that a union's construction of its constitution is not binding on the courts where there is a dispute. The cases note, nevertheless, that the construction "should be considered and accorded some weight," *Parish,* 450 F.2d at 827, and "is persuasive, especially when no evidence of bad faith is presented." *Stelling,* 587 F.2d at 1389 n. 11. Even under a disputed interpretation, therefore, because no bad faith has been alleged, the international union's interpretation of the President's authority to enter into project agreements should be accorded some weight.

More importantly, both cases stress that the "dispute" which reduces the authority of the union's interpretation must be more than a single disagreement by a few disaffected locals or members. Under *Parish,* a union interpretation was held not to control only when that construction "repeatedly has been questioned by other parties...." 450 F.2d at 827. *Stelling* distinguished *Parish* because in *Stelling* the plaintiffs "demonstrated no repeated past history of controversy surrounding the interpretation of the sections disputed here." 587 F.2d at 1389 n. 11. Local 640 can only point to an unsuccessful attempt at the 1974 International Convention as evidence of "dispute." This does not show a "repeated past history of controversy" and thus, the international union's interpretation is "entitled to great, if not controlling, weight." *Parish,* 450 F.2d at 827. We are unable to find that interpretation unreasonable, and no bad faith has been shown. Further, Local 640 has proffered only a mere scintilla of factual evidence to support its interpretation of the constitution.

### 3. Directed Verdict for Bechtel

The district court directed a verdict for Bechtel, concluding that because the IBEW President had been found to have actual authority, then Bechtel was also relieved of liability. Because we affirm the district court's judgment that the union's interpretation of the President's constitutional authority should not be reversed, we also affirm the directed verdict for Bechtel.[12]

### III. Other Issues

Because of our affirmance of the district court, we need not consider plaintiffs' challenge to the district court's denial of class certification or plaintiffs' punitive damages claim. Nor need we consider whether the case of *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976), displaces common law principles

12. We do not need to consider the additional grounds relied on by the district court, that Bechtel reasonably believed the President had authority. We note, however, that the record does not provide any substantial evidence that Bechtel had knowledge that the IBEW constitution prohibited the President from entering into the Stabilization Agreement without local approval. Local 640 failed to mount a formal challenge to the President's authority until after the execution of the Agreement by Bechtel.

of agency in labor contracts, as plaintiffs contend, because we find that the IBEW President had actual authority to enter into the Stabilization Agreement and thus, Bechtel did not need to depend upon apparent authority under principles of agency. Other evidentiary and procedural contentions are also rendered moot by our disposition.

## CONCLUSION

We affirm the grant of summary judgment on the antitrust claims because plaintiffs were not the proper parties to bring such claims. We affirm the district court's holding that plaintiffs cannot recover as third-party beneficiaries under the Amended Specialty Agreement because the Specialty Agreement expressly provided for modification by the parties. We affirm the directed verdicts in favor of the union defendants and Bechtel because we cannot say that the IBEW's interpretation of its constitution was unreasonable or made in bad faith. The judgment of the district court is

AFFIRMED.

## APPENDIX

### BACKGROUND OF LITIGATION

The district court dismissed the original complaint with leave to amend. Various amended complaints were filed and additional plaintiffs and defendants were added. The First Amended Complaint added the Building and Construction Trades Department (AFL–CIO) ("BCTD") as defendant on all counts and added Local 640 as plaintiff on the labor law counts. Count One of First Complaint stated a claim by Lucas and Bigbey (Local 640 was not a plaintiff) for violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and sought damages and injunctive relief under sections 4 and 16 of the Clayton Act. 15 U.S.C. §§ 15, 26. The Complaint alleged that the Stabilization Agreement evidenced a conspiracy to restrain trade by imposing artificially low wages for electricians, in furtherance of a larger conspiracy to monopolize interstate commerce in the design and construction of nuclear power plants in the United States. Lucas and Bigbey claimed they were injured by the illegally depressed wages. The district court dismissed this antitrust count with prejudice, holding that Lucas and Bigbey lacked standing. The labor law claims were dismissed with leave to amend.

Counts Two through Five of the Second Amended Complaint presented labor law and contract claims based on the same facts, added Local 640 as plaintiff, and named the BCTD and its 17 constituent international unions, including the IBEW, as defendants.

Count Two of the Second Amended Complaint presented a claim under section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185 (1982) (LMRA), that Bechtel breached the Amended Specialty Agreement, and through it, the Inside Agreement. For this breach, Lucas and Bigbey sought damages equal to the difference between what they were paid for electrical work performed on the Palo Verde project and what they would have been paid under the Inside Agreement. Count Three was against Bechtel for refusing to comply with the arbitral award issued at the NECA grievance meeting. NECA found that Bechtel had violated the Inside Agreement by failing to post a surety bond and by failing to pay (1) electricians at the rate stated in the agreement, (2) contributions to Local 640's Equal Employment Opportunity Fund, and (3) contributions to the local's Warranty and Promotion Fund. Plaintiffs sought enforcement of the NECA award and damages.

Count Four was brought under 28 U.S.C. § 2201 (1982), and LMRA section 301 for a declaratory judgment that Local 640 had not consented to the Stabilization Agreement as required by Article IV, § 3(13) of the IBEW constitution, and that the Inside Agreement applied to the Palo Verde project. Finally, in Count Five, the plaintiffs brought a claim under section 301 against the IBEW for breach of contract,

alleging that it had violated its own constitution.

All the claims were finally dismissed by the district court in 1978. On appeal, we reversed and remanded, concluding that the Second Amended Complaint should not have been dismissed without allowing sufficient fact gathering as required under Fed. R.Civ.P. 12(b)(6), and that the antitrust claim was prematurely dismissed. *Lucas v. Bechtel,* 633 F.2d 757, 760 (9th Cir.1980) (*Lucas I*). We expressed "no opinion whatsoever as to whether upon fuller consideration, these claims in fact withstand scrutiny." *Id.*

On remand, the district court granted summary judgment on the antitrust claims, ruling that lost wages were not "business or property" within the meaning of the Clayton Act. We granted plaintiffs' petition for mandamus, citing *Lucas I,* and directed the district court to vacate its order, as "diminution of wages may constitute injury to 'business or property' within the meaning of the Clayton Act." (*Lucas II*) We also directed the district court to determine whether plaintiffs had standing under sections 4 or 16 of the Clayton Act in light of our then-recent decision in *California State Council of Carpenters v. Associated General Contractors of California, Inc.,* 648 F.2d 527, 537–39 (9th Cir.1980), which was later reversed, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

At the rehearing, the district court granted summary judgment on the grounds that Lucas and Bigbey lacked standing as they were not within the "target area" of the alleged antitrust violations. This court declined to review by mandamus.

Plaintiffs, meanwhile, filed a motion to certify this case as a class action. Although a magistrate recommended that a class be certified, the district court denied certification. Plaintiffs sought extraordinary intervention by this court and we directed the district court to provide a written statement of reasons for denial of class certification, as required by Fed.R.Civ.P. 23. The district court did so. It found that there were individualized proof questions as to both the fact of damage and the amount of damage, if any, and that common questions did not predominate. Thus, the district court concluded a class action would be an inferior method to adjudicate the case. We declined to grant any interlocutory review.