SUNDANCE LAND CORPORATION, a Washington corporation, Plaintiff–Appellant,

v.

COMMUNITY FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION; Columbia River Service Corporation, et al., Defendants–Appellees.

No. 86–3503.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 3, 1986.

Decided Feb. 23, 1988.

Before FLETCHER, FERGUSON and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

## I. INTRODUCTION

This action arises out of a loan transaction that was consummated between the several appellees, allegedly to the ultimate detriment of the appellant, Sundance Land Company ("Sundance"). Sundance seeks monetary damages and injunctive relief based upon appellees' alleged violations of the 1982 Amendments to the Home Owners' Loan Act of 1933 (HOLA), 12 U.S.C. § 1461 *et seq.*, the federal common law and Washington State doctrines of *quo warranto*, and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* Several other pendent state law claims are also pleaded. The district court granted defendants' Motion to Dismiss all causes of action pursuant to Rule 12(b)(6), Fed.R.Civ.P. We now reverse that holding, and conclude that appellant alleges facts sufficient to state a claim for injunctive relief under the Home Owners' Loan Act, but not for damages under that Act, or under RICO. We also hold that relief based on the doctrine of quo warranto is inappropriate. The remaining pendent claims are remanded for further consideration in light of our holding on the HOLA injunctive relief claim.

## II. BACKGROUND

Review of a dismissal for failure to state a claim under Fed.R.Civ.P. 12(b)(6) is *de novo*. *Kelson v. City of Springfield*, 767 F.2d 651, 653 (9th Cir.1985). We accept all material allegations in the complaint as true and construe them in the light most favorable to the appellant. *Id.* When we apply this standard of review to the facts alleged in appellant's complaint and first amended complaint, we accept the following facts as true. On or about September 1, 1983, title to the land at issue, a fruit

John C. Riseborough, Keith A. Trefry, Paine, Hamblen, Coffin, Brooke & Miller, Spokane, Wash., for plaintiff-appellant.

Douglas M. Ragen, Portland, Or., for defendants-appellees.

orchard located in the state of Washington, was in appellee Brenner, and was encumbered, in the following order, by a $1.5 million mortgage in favor of Mutual of New York, $1.8 million in favor of appellee Community First Federal Savings & Loan Association ("Community"), and $300,000 to $1.8 million in favor of Holeman Limited Partnership ("Holeman"), appellant Sundance's predecessor.

In September, 1983, Brenner and Community represented to Holeman that Community was willing to lend Brenner $8 million so that Brenner could pay off Community's existing $1.8 million lien, make improvements to the orchard property, and supply the orchard needed operating capital. Community conditioned its commitment to lend the $8 million upon Holeman subordinating its mortgage to the new loan, so that Community's expanded loan would be in a second lien position, inferior only to Mutual of New York's.

Relying upon Community's and Brenner's representations that the new loan was necessary to insure the continued viability of the orchard, Holeman agreed to release its existing superior mortgage. Thereafter, Community agreed to grant Brenner the $8 million loan. Unbeknownst to Holeman, Brenner agreed not only to pay off the loan but also to construct two motels on land he owned and to convey them clear of all encumbrances to Community. To construct the motels, Brenner, in accordance with its agreement with Community, diverted several million dollars of the loan proceeds from orchard improvements and maintenance. Because he could not make needed repairs in the orchard, its market value declined.

In 1984, Sundance acquired Holeman's mortgage. At about the same time, Brenner defaulted on the underlying obligations. Following Brenner's default, Sundance sought to collect its debt and foreclose its mortgage. When Sundance considered initiating foreclosure proceedings, however, Brenner and Community falsely represented to Sundance that the orchard was worth more than the existing mortgages on the property, and that a substantial portion of the loan proceeds was in fact being used to make improvements to the orchard. In reliance on these representations, Sundance accepted a quitclaim deed to the property from Brenner in lieu of foreclosing on the mortgage.

When Sundance learned of the extensive use of the orchard loan proceeds to build the two motels and of the decline of the orchard, it brought this action in federal court seeking to enjoin Community from foreclosing on the orchard property, and also damages. Community has since filed suit in Washington state court to foreclose on the mortgage, and the Grant County Superior Court has ruled that foreclosure would be improper, based on the equitable doctrine of "unclean hands." *Community First Federal Savings v. Brenner, et al.,* No. 85–2–00073 (April 2, 1987).

### III. HOME OWNERS' LOAN ACT

Sundance alleges that by requiring Brenner to erect two motels as part of the loan fee, Community violated an anti-tying provision of the Home Owners' Loan Act, 12 U.S.C. § 1461 *et seq.* Section 1464(q)(1)(B) prohibits federally chartered savings and loan associations from conditioning the extension of credit on a customer's agreement to provide some property, credit, or service which is not of the type usually related to and usually provided in connection with the granting of such credit.[1] The issue on this appeal is whether Sundance, which was not a party to the allegedly illegal loan, has standing to challenge the validity of the loan and to recover damages and obtain injunctive relief. The district

---

1. Section 1464(q)(1) of HOLA provides, in relevant part:

 An association shall not in any matter extend credit, lease, or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement— ...

 (B) that the customer provide additional credit, property, or service to such association, or to any service corporation or affiliate of such association, other than those related to and usually provided in connection with a similar loan....

 12 U.S.C.A. § 1464(q)(1)(B) (Supp.1987).

court held that it did not. We reverse that holding in part, concluding that Sundance has standing to obtain injunctive relief but not to recover damages.

Standing is conferred upon a section 1464(q)(1)(B) claimant by section 1464(q)(2)(A), and section 1464(q)(3) which provide, respectively, that any "person" may sue for injunctive relief against threatened loss or damage as a result of a section 1464(q)(1) violation, and that any "person" injured in his or her business or property may sue for damages.[2] The Act is silent as to the meaning of the term "person", and there are no cases interpreting that term under HOLA. Because of this silence, and because the language of HOLA's anti-tying damages provision, section 1464(q)(3), is identical to section 4 of the Clayton Act, 15 U.S.C. § 15(a),[3] the district court applied antitrust standing doctrine to the damages claim. Standing under section 4 of the Clayton Act is limited to direct, as opposed to indirect, purchasers of goods priced higher because of a price-fixing agreement. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). Applying this doctrine to the instant facts, the district court denied Sundance standing to seek damages on the ground that Sundance was not a direct party to the loan transaction between Brenner and Community but only a successor to the borrower.

Regarding the claim for injunctive relief, the district court again applied standing principles governing relief under the antitrust laws, specifically section 16 of the Clayton Act[4]; this provision is similar in substance to section 1464(q)(2)(A), the analogous HOLA provision.[5] Because the district court found that the misrepresentation to Sundance and not the actual loan transaction was the proximate cause of Sundance's injury, it held that Sundance lacked standing.

On appeal, the parties agree with the district court that HOLA's standing provisions should be read in light of antitrust standing law. We, too, find that antitrust standing principles provide substantial guidance in cases involving HOLA's anti-tying provisions.

First, we, like the district court, observe that HOLA's and the Clayton Act's damages provisions and those governing injunctive relief are, in substance, very similar. Equally important, the purposes of the anti-tie-in provisions of HOLA and antitrust law are similar in that they are both generally designed to guard against coercive trade practices that interfere with consumers' preferences and with their oppor-

---

**2.** Section 1464(q)(2)(A), which governs injunctive relief, provides:

> Any person may sue for and have injunctive relief ... against threatened loss or damage by reason of a violation of paragraph (1), under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity and under the rules governing such proceedings.

12 U.S.C.A. § 1464(q)(2)(A) (Supp.1987).

Section 1464(q)(3), which governs recovery of damages, provides, in relevant part:

> Any person who is injured in his business or property by reason of anything forbidden in paragraph (1) may sue therefor ... and shall be entitled to recover three times the amount of the damages sustained by him, and the cost of suit, including a reasonable attorney's fee....

12 U.S.C.A. § 1464(q)(3) (Supp.1987).

**3.** Section 4 of the Clayton Act allows that "any person who shall be injured in his business or property by reason of anything forbidden in the

antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C.A. § 15(a) (Supp. 1987). The identical HOLA damages provision is set forth in note 2 *supra*.

**4.** Section 16 of the Clayton Act, 15 U.S.C. § 26, provides, in relevant part:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings....

15 U.S.C.A. § 26 (Supp.1987).

**5.** Section 1464(q)(2)(A), which governs injunctive relief under HOLA, is set forth in note 2 *supra*.

tunities to seek services on the most favorable terms. For example, subsection A of section 1464(q)(1) prohibits a lender from requiring a customer to use that same lender for additional services. Subsection C provides that a lender may not prevent a borrower from using a different lender for such services.[6] These provisions mirror traditional antitrust tie-in rules. *See, e.g., United States v. Loew's*, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); *International Salt Co. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). Subsection B, the section involved here, departs from the classic tying model but is designed to deal with a closely-related coercive trade practice—the exaction of harsh or unusual terms of repayment. In enacting the tie-in prohibitions of section 1464(q)(1), Congress sought in large part to aid consumers by outlawing anti-competitive practices that constituted abuses of lending institutions' economic power. While subsection B is not in itself an anticompetitive provision, we believe that it serves the same underlying proconsumer purposes as the traditional anti-tying provisions, and that application of antitrust standing principles to that subsection as well as to the rest of the section is consistent with its general purpose.

■ We also observe that Congress intended that the standing rules be the same for all three subsections of 1464(q)(1), as opposed to one rule of standing for subsection B, and another for subsections A and C. That intent is demonstrated by the fact that when it enacted Section 1464(q)(1) Congress adopted a single provision governing damages and a single provision governing injunctive relief, and that these provisions were made applicable to all three subsections. Furthermore, we note that no court that has interpreted the anti-tie-in provisions of the Bank Holding Company Act (BHCA), 12 U.S.C. § 1972(1), three of which are identical to the three provisions contained in section 1464(q)(1), has applied one standing rule to one subsection and a different rule to another.[7] *See, e.g., Campbell v. Wells Fargo Bank, N.A.*, 781 F.2d 440, 443 (5th Cir.), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986) (applying BHCA standing provision to the BHCA tie-in prohibition identical to subsection B).

The very close relationship between the HOLA anti-tie-in provisions and the anti-tie-in provisions of the BHCA provides an additional reason to resort to antitrust standing principles for guidance here. The Senate Report accompanying the 1982 HOLA amendments noted that section 1464(q)(1) of HOLA "applies the anti-tying restrictions to Federal thrifts in a manner generally comparable to the anti-tie-in provision applicable to bank holding companies under the Bank Holding Company Act of 1956, as amended." Senate Report No. 97–536,

---

**6.** Subsections A and C of section 1464(q)(1) provide:

(1) An association shall not in any manner extend credit, lease, or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—

(A) that the customer shall obtain additional credit, property, or service from such association, or from any service corporation or affiliate of such association, other than a loan, discount, deposit, or trust service;

. . . . .

(C) that the customer shall not obtain some other credit, property, or service from a competitor of such association, or from a competitor of any service corporation or affiliate of such association, other than a condition or requirement that such association shall reasonably impose in connection with credit transactions to assure the soundness of credit.

**7.** 12 U.S.C. § 1972(1) provides, in relevant part:

(1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—

(A) that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service;

(B) that the customer shall obtain some additional credit, property, or service from a bank holding company of such bank, or from any other subsidiary of such bank holding company;

(C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service....

12 U.S.C.A. § 1972(1) (1980). The virtually identical anti-tie-in provisions of HOLA are provided in notes 1 and 5 *supra*.

97th Cong. 2d Sess., *reprinted in* 1982 U.S.Code Cong. & Admin.News 3054, 3109. Moreover, the BHCA standing provisions for damages and injunctive relief are virtually identical to the HOLA standing provisions.[8]

In light of the close relationship between these two statutes, we are influenced by the Fifth Circuit's view that reference to antitrust standing principles when construing BHCA tie-in provisions is " 'most pertinent in view of the substantial similarity of the [BHCA and Clayton] Acts.' " *Campbell v. Wells Fargo Bank, N.A.*, 781 F.2d at 443 (quoting *Swerdloff v. Miami Nat. Bank*, 584 F.2d 54, 58–59 (5th Cir.1978)); *see Exchange National Bank of Chicago v. Daniels*, 768 F.2d 140, 143 (7th Cir.1985) (treating subsection A of section 1972(1) "as the banking equivalent of § 3 of the Clayton Act, 15 U.S.C. § 14"). Indeed, the purpose of the BHCA, like HOLA's, is "to prohibit anti-competitive [banking] practices which require bank customers to accept or provide some other service or product or refrain from dealing with other parties in order to obtain the bank product or service that they desire." S.Rep. No. 91–1084, 91st Cong. 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News 5519, 5535; *see Lancianese v. Bank of Mount Hope*, 783 F.2d 467, 469 (4th Cir.1986); *Campbell v. Wells Fargo Bank, N.A.*, 781 F.2d at 443; *Flintridge Station Associates v. American Fletcher Mortgage Co.*, 761 F.2d 434, 437 (7th Cir.1985); *Parsons Steel, Inc. v. First Alabama Bank*, 679 F.2d 242, 245 (11th Cir.1982) ("purpose and effect of § 1972 is to apply the general principles of the Sherman Antitrust Act prohibiting anti-competitive tying arrangements specifically to the field of commercial banking....").

Because the purpose and effect of the BHCA are similar to those of the antitrust laws, and have been construed similarly, and because Congress intended to extend the anti-tie-in restrictions of the BHCA to HOLA when it enacted section 1464(q)(1), we must give decisions under both the BHCA and the antitrust laws substantial weight when deciding HOLA cases.

*A. Standing to Recover Damages*

■ Sundance claims that it is entitled to treble damages because Community violated HOLA when it required that Brenner build two motels in exchange for the loan. The transaction occurred at a time when Sundance was not even a creditor of Brenner. We conclude that application of appropriate standing principles to Sundance's HOLA claim for damages precludes the award of such relief.

Although under the antitrust law the lack of restrictive language reflects Congress' "expansive remedial purpose" and its "broad ... deterrent objectives", *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 472, 473, 102 S.Ct. 2540, 2544, 2543, 73 L.Ed.2d 149 (1982), we recently explained that " 'Congress did not intend to provide a private remedy for all injuries that might conceivably be traced to an antitrust violation.' " *Lucas v. Bechtel Corp.*, 800 F.2d 839, 843 (9th Cir.1986) (quoting *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 448 (9th Cir.), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3481, 87 L.Ed.2d 616 (1985)); *see Blue*

---

**8.** 12 U.S.C. § 1975, which governs damages for BHCA anti-tie-in violations, provides, in relevant part:

> Any person who is injured in his business or property by reason of anything forbidden in section 1972 of this title may sue therefor ... and shall be entitled to recover three times the amount of the damages sustained by him, and the cost of suit, including a reasonable attorney's fee.

12 U.S.C.A. § 1975 (1980). The identical HOLA damages provision is set forth in note 2 *supra*.

The statutory provision which governs the imposition of injunctive relief for violations of the BHCA anti-tie-in provisions, 12 U.S.C. § 1976, provides, in relevant part:

> Any person may sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by reason of a violation of section 1972 of this title, under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity and under the rules governing such proceedings....

12 U.S.C.A. § 1976 (1980). The identical HOLA standing provisions governing both damages and injunctive relief are set forth in note 2 *supra*.

*Shield of Virginia v. McCready,* 457 U.S. at 477, 102 S.Ct. at 2547 ("Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property.") Accordingly, standing under section 4 of the Clayton Act is more limited than under Article III. *See Associated General Contractors of California v. California State Council of Carpenters,* 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983) ("Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action."); *see also Lucas v. Bechtel Corp.,* 800 F.2d at 843; *Bubar v. Ampco Foods, Inc.,* 752 F.2d at 448.

In *Associated General Contractors,* a leading antitrust damages case, two unions alleged that a multi-employer association and its members coerced certain business entities into entering into contractual relationships with nonunion firms. The unions contended that this coercion served to restrain the trade of certain unionized firms and thereby adversely affected and injured the business activities of the unions with which the unionized firms had contracts. In holding that the unions did not have standing under section 4, the Court emphasized the fact that it was the unionized firms and not the unions who were the objects of the restraint in trade. The Court therefore rejected the unions' damages claim, relying on, among other factors, the potential for duplicative recovery or complex apportionment of damages, as well as the indirectness of the injury and the existence of more direct victims. 459 U.S. at 539–44, 103 S.Ct. at 909–12. *See also Cargill, Inc. v. Monfort of Colorado,* 479 U.S. 104, 107 S.Ct. 484, 490 n. 6, 93 L.Ed.2d 427 (1986).

The factors the Court relied on in *Associated General Contractors* are equally present here. Sundance claims that it was damaged, ultimately, by the diversion of a significant part of the $8 million loan from orchard improvements and maintenance to the construction of the two motels. However, Brenner and Community were the sole parties to the loan, and it was Brenner, not Sundance who was obligated to build the two motels in return for the loan. At the time of the loan, Sundance was not even Brenner's creditor and had no interest of any kind in the land. It was simply a wholly disinterested corporation which subsequently acquired an interest in the property. Brenner was the party directly injured by the allegedly unlawful loan and Sundance's injury was only an indirect consequence. Because Brenner was directly injured, he would have standing to bring a suit for treble damages. Thus, the same spectre of duplicative recovery and complex apportionment of damages that was present in *Associated General Contractors* is present here. We conclude that Sundance's monetary injury would not meet the standing requirements of section 4 of the Clayton Act.

The lack of directness of the injury has also proved a bar to relief under the BHCA damages provision, 12 U.S.C. § 1975.[9] In *Campbell v. Wells Fargo Bank, N.A., supra,* for example, the court denied recovery of monetary relief because the injuries claimed were not a "direct consequence" of the alleged activities of the defendants. 781 F.2d at 443. In *Campbell,* plaintiffs, investors who advanced funds and equipment to LEXCO, a drilling company, asserted that the illegal tying activities of the defendant banks forced LEXCO into bankruptcy and that this, in turn, required LEXCO to cease its drilling operations. The cessation of drilling operations allegedly resulted in creditors of LEXCO imposing liens on the wells, liens which encumbered the working interests of the plaintiffs. The court held that the plaintiffs might have been damaged by LEXCO's inability to meet its obligations, but that the injury was not a direct consequence of the alleged tie-in violations. *Id.* Here, Sundance's monetary injury is no more direct than that of the plaintiffs in *Campbell.*

9. This provision is set forth in note 8 *supra.*

Thus, Sundance would not have standing to recover damages under the BHCA or antitrust law. We see no need to depart from the rules developed under those statutes to determine standing in this case. As we have discussed above, the same problems associated with treble damage recoveries that have caused courts to deny standing to remote parties in antitrust cases exist here. We therefore conclude that Sundance does not have standing to recover damages under section 1464(q)(3) of HOLA.[10]

B. *Standing to Obtain Injunctive Relief*

Sundance also seeks to enjoin Community from foreclosing on the orchard property. Again an antitrust standing provision, section 16 of the Clayton Act, 15 U.S.C. § 26, provides us with considerable guidance. Section 16 is substantially similar to the parallel HOLA injunction provision, 1464(q)(2)(A).[11]

The standing requirements under section 16 of the Clayton Act are "less stringent" than those under section 4. *Lucas v. Bechtel Corp.*, 800 F.2d at 847 (quoting *Bubar v. Ampco Foods, Inc.*, 752 F.2d at 449 n. 2, and citing *Lucas v. Bechtel Corp.*, 633 F.2d 757, 760 (9th Cir.1980) (*Lucas I*)); *Parks v. Watson*, 716 F.2d 646, 662 (9th Cir.1983); *see Hawaii v. Standard Oil Co.*, 431 F.2d 1282, 1284–85 (9th Cir.1970), *aff'd*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); 2 P. Areeda & D. Turner, *Antitrust Law* § 335e (1978). Parties who cannot recover damages may nevertheless obtain injunctive relief. There were good reasons for Congress' decision to adopt different requirements for the two forms of relief. As we said in *In Re Multi–District Vehicle Air Pollution*, 481 F.2d 122, 130 (9th Cir.), *cert. denied*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973):

In contrast to section 4, section 16 does not involve punitive and potentially disastrous judgments for treble damages and attorneys' fees; neither is there the potential threat of duplicative recoveries. (footnote omitted). *See Cargill, Inc. v. Monfort of Colorado*, 107 S.Ct. at 490 n. 6. The fact that more than one party has standing to obtain the same injunction poses no undue difficulties for the court or the defendant. Accordingly, when injunctive relief is sought, it does not matter that there are other parties who may have been more directly injured. All that is required is that a claimant show a " 'threatened loss or injury cognizable in equity proximately resulting from the alleged antitrust violation,' " *Lucas*, 800 F.2d at 847 (quoting *Parks*, 716 F.2d at 662), and that the injury be of the type the antitrust laws were designed to prevent. *Cargill, Inc. v. Monfort of Colorado*, 107 S.Ct. at 490–91.

When we apply these standing principles to the instant facts, we find Sundance's allegations sufficient to serve as a basis for injunctive relief. To establish equitable grounds for such relief, a claimant must show that he or she has no adequate remedy at law and that denial of the relief sought would cause immediate, irreparable injury. *See, e.g., Burrus v. Turnbo*, 743 F.2d 693, 699 (9th Cir.1984). Denial of the injunction would, according to the allegations of the complaint, cause Sundance immediate, irreparable injury. According to Sundance, it would lose the orchard property if Community were allowed to foreclose. Since the property at issue is unique, Sundance's legal remedy—i.e., damages—is inadequate. Sundance's complaint therefore meets the equitable criteria for stating a cause of action for injunctive

---

10. In holding that Sundance's injury is too indirect to support standing to seek damages under HOLA, we are not suggesting that persons other than customers cannot enjoy such standing. In this connection we note that Congress used the term "customer" in subsection B and then used the much broader term "any person" in the damages provision, which suggests that standing is not limited to customers. *See* discussion, *infra*, of injunctive relief and *Campbell*, 781 F.2d at 442. We need not now decide in what

other contexts persons other than customers may seek damages under section 1464(q)(3).

11. The injunction provision of the BHCA, 12 U.S.C. § 1976, which utilizes language identical to section 1464(q)(2)(A) of HOLA, *see* note 8 *supra*, has not yet been interpreted by the courts, and so cannot provide us with any guidance.

relief.[12]

We next consider whether under the facts set forth in the complaint the threatened loss proximately results from the alleged HOLA violation. Proximate causation is "merely the limitation which the courts have placed upon the actor's responsibility for the consequences of the actor's conduct." Prosser & Keeton, *The Law of Torts* § 41, at 264 (5th ed. 1984). It requires that the wrongful conduct be both the factual and legal cause of the injury.

Regarding factual causation, Sundance alleges that construction of the two motels required Brenner to divert "several million dollars" of the $8 million loan away from orchard improvements and maintenance, and thereby adversely affected the orchard's value. Sundance further contends that this diversion caused Brenner's inability to pay back the money he owed to Sundance, which in turn prompted Sundance to accept the quitclaim deed, so that it now is at risk of losing the property as a result of foreclosure. According to Sundance, were it not for the building of the two motels and the concomitant diversion of funds, the orchard's value would be significantly enhanced and the risk of foreclosure would not exist. Thus, Sundance concludes, were it not for the illegal terms of the loan, it would not now face imminent injury through loss of the property. We find these facts, if true, sufficient to establish that the allegedly illegal loan agreement is a factual cause of Sundance's threatened injury.

In reaching our conclusion regarding factual causation, we note that the able district judge held that the alleged misrepresentation, and not the loan transaction itself, proximately caused Sundance's injury, and denied standing on that ground.

While we do not doubt that Community's misrepresentations were also a cause of the injury, if only an intervening cause, we find that the loan transaction was the original cause of the injury, and that, notwithstanding the subsequent events, it remained the proximate cause. The question is whether Community should be relieved of responsibility for the consequences of the illegal loan, and its HOLA liability superceded by virtue of the fact that it later misrepresented facts about the loan to Sundance. *See* Prosser & Keeton, *supra*, § 44, at 302. To answer such a question, courts look to the original forseeable risk the defendant created. *Id.* As we note *infra* in our discussion of legal causation, we find that it was forseeable to Community that Brenner, its customer, would pass on his interest to one of his creditors, voluntarily or involuntarily. Equally important, it was also forseeable to Community that it would itself misrepresent the facts to Brenner's successor. A defendant who causes the original risk of harm may not claim that a subsequent act which he perpetrates and has complete control over was somehow unforeseeable to him, and so constitutes a superceding cause. *See id.* at 301 ("An intervening cause is one which comes into active operation in producing the result *after the negligence of the defendant.*") (emphasis supplied) (footnote omitted). Because Community, the perpetrator of the original cause also perpetrated the misrepresentation, or intervening cause, the latter event does not constitute a superceding cause. Community may not escape liability from entering into and benefitting from the illegal loan agreement simply by later misrepresenting the facts concerning the agreement. Were we to hold otherwise, a defendant could immunize itself from liability for costly acts (treble damages, for example) by com-

12. Since the time of the district court's decision, the Washington state trial court has enjoined Community from foreclosing on the property on the ground of unclean hands. That subsequent action does not affect our decision. The state court order is not final, and it does not purport to resolve the issue of HOLA standing or any other ground of this appeal. The appeal before us is from a motion to dismiss, not from any other type of order. We need not consider here, for example, what effect a state court injunction would have on the question of threatened injury if the state court order were in effect at the time a district court was considering a request for temporary or permanent injunctive relief on the merits.

mitting a second, less costly wrong.[13]

Proximate causation also requires that the wrongful conduct be the legal cause of the injury. This inquiry essentially depends upon "whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred." *Id.* § 42, at 273. *See, e.g., Blue Shield of Virginia v. McCready,* 457 U.S. at 478 n. 13, 102 S.Ct. at 2547 n. 13 (" 'What is a cause in a legal sense, still more what is a proximate cause, depend in each case upon many considerations.... What we do mean by the word "proximate" is, that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point.' ") (quoting *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 351–52, 163 N.E. 99, 103 (1928) (Andrews, J., dissenting)). The scope of liability should ordinarily extend to but not beyond the scope of the "forseeable risks". Prosser & Keeton, *supra,* § 42, at 273.

■ In determining the existence of legal causation, we first observe that standing to seek injunctive relief is not limited to actual customers of the lending institution. This is clear from the fact that Congress chose to use the word "customer" in subsection B of section 1464(q)(1), and the more inclusive word "person" in the standing provision, section 1464(q)(2)(A). "[W]here Congress has carefully employed a term in one place and excluded it in another, it should not be implied where excluded." *Pena Cabanillas v. United States,* 394 F.2d 785, 789 (9th Cir.1968); *see Federal Trade Commission v. Sun Oil Co.,* 371 U.S. 505, 514–15, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963); 2A N. Singer & C. Sands, *Sutherland's Statutory Construction* § 47.23 (4th ed. 1984). Relying on this theory, the Fifth Circuit in *Campbell v. Wells Fargo Bank N.A.,* 781 F.2d at 443, reversed a district court holding that non-customers lacked standing *per se* to seek damages for anti-tie-in provisions of the BHCA.

■ Given Congress' broad remedial purpose to prohibit lending institutions from using their power to coerce customers to provide unusual consideration for a loan, such as newly constructed motels, and the fact that standing to recover injunctive relief under section 1464(q)(2)(A) is not limited to customers, we conclude that to extend standing for injunctive relief to successors in interest to property used to secure payment of the loan is wholly consistent with Congress' policy. Indeed, when a financially troubled customer assigns his interest in mortgaged property to another, voluntarily or involuntarily, frequently it is only the successor in interest who will be able to seek injunctive relief, for only the successor may risk actual threatened harm, i.e., a foreclosure, as a result of the lending institution's attempts to enforce the terms of the loan. To find that the successor in interest would not have standing in such circumstances would contravene public policy, for lending institutions would be able to enforce illegal agreements with impunity in cases in which customers finding themselves in financial difficulty as a result of the unlawful loan were compelled to assign their property rights or interests to successors.

■ Finally, with respect to legal cause, irrespective of public policy, it is foreseeable to a lending institution that a creditor or a beneficiary of one of its customers may acquire the property interest prior to the time the loan is due, and thus be the party to face the threatened injury resulting from the unlawful terms of the loan agreement.

In light of these considerations of public policy and foreseeability, we find that application of antitrust standing principles leads us ineluctably to the conclusion that an illegal loan under HOLA may be the legal cause of the threatened injury to a successor in interest to the borrower. Thus, in this case, loss of the orchard property may proximately result from the alleged HOLA violation.

---

**13.** Our discussion here applies just as fully to Community's earlier alleged misrepresentation to Holeman.

The last obstacle to establishing standing under the antitrust laws is the requirement that the alleged injury be of the type the antitrust laws were designed to prevent. *Cargill, Inc. v. Monfort of Colorado*, 107 S.Ct. at 490–91. This requirement derives from *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), in which the Court held that plaintiffs seeking treble damages under section 4 must show more than an "injury causally linked" to a particular antitrust violation; additionally, "plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Id.* at 489, 97 S.Ct. at 697. In *Cargill*, the Court extended this requirement to actions for injunctive relief under section 16. 107 S.Ct. at 490–91. There, the plaintiff, a large beef-packing firm, sought to enjoin the merger of the second and third largest beef-packing firms in the industry. The plaintiff asserted that the defendant would be able to lower its prices due to "multiplant efficiencies," which would require plaintiff to lower its prices, thus lowering its profits. *Id.* at 491–92. The Court held that the lost profits did not constitute antitrust injury since loss of profits due to the increased efficiencies of one's competitors was not the type of injury the rules against illegal mergers were designed to prevent, *id.* at 492–93. Thus, injunctive relief was not available.

We have some doubt as to the usefulness of this final requirement—injury of the type the statute was designed to prevent—in cases involving subsection B of HOLA's anti-tie-in provisions. The requirement of antitrust injury evolved due to the generality of the antitrust statutes and the complexity and interdependence of modern business relationships; a violation of the antitrust laws often significantly affects many different economic actors in myriad ways, some of which are not within the intended scope of the antitrust laws. Courts therefore recognized the need to limit antitrust standing beyond the requirement of proximate causation. *See generally Cargill*, 107 S.Ct. at 488–90. However, those concerns are not present in HOLA cases. The types of injury caused by violations of subsection B are fairly limited and predictable, as is the statutory provision itself. Thus, a showing of equitable injury and proximate causation in fact and law may be sufficient to justify injunctive relief under HOLA, at least for a violation of subsection B. Nevertheless, we do not decide that question now but instead proceed to address the final requirement as if it were applicable here.

Subsection B of HOLA's anti-tie-in provision prohibits savings and loan associations from conditioning the extension of credit on a customer's agreement to provide some property, credit or service that is not of the type usually provided in connection with the granting of such credit. Congress thereby sought to protect borrowers from being coerced into providing unusual forms of payment or compensation in return for a loan (although it did not limit its prohibition to coerced agreements). Congress desired to protect borrowers from entering into agreements that might pose a significant threat of economic injury. It was concerned that consumers, out of ignorance or need, would enter into unfair agreements that might cause economic hardship. One of the obvious hardships that might result would be the customer's inability to pay back the loan and the resultant loss of the property used as security for its repayment. Sundance's threatened injury, i.e., the foreclosure on the orchard property proximately resulting from an illegal loan agreement, thus constitutes precisely the type of injury that Congress sought to prevent when it enacted the anti-tie-in provisions of HOLA.

Since, under the facts alleged in the complaint, Sundance's threatened injury is cognizable in equity, proximately results from the alleged HOLA violation, and is of the type HOLA sought to prevent, we conclude that it has standing to challenge the legality of the loan and to enjoin foreclosure of the property. Accordingly, we reverse the holding of the district court and find that Sundance has standing under section 1464(q)(2)(A) to seek injunctive relief.

## IV. QUO WARRANTO

Sundance also seeks to enjoin enforcement of the loan under the doctrine of *quo warranto.* It suggests two bases upon which to support its claim: a Washington statute, RCW 7.56.010(5), and the federal common law.

■ The Washington statute provides for a *quo warranto* action against a corporation that exercises powers not conferred by law. RCW 7.56.010(5). However, such an action can only be brought by the district attorney's office, or by private parties who claim an interest in the corporation. RCW 7.56.020. The one *quo warranto* Washington state case upon which appellant relies does not deviate from this rule. *State ex rel. Hamilton v. Standard Oil Co.,* 176 Wash. 231, 28 P.2d 790 (1934). Since appellant is a private party and it has not alleged any facts showing that it enjoys some interest in Community, it cannot assert a claim in *quo warranto* under Washington law.[14]

■ The federal common law remedy of *quo warranto* is not applicable in cases challenging the lawfulness of a loan or seeking an injunction against collection of a debt or foreclosure on property. Historically, the federal common law remedy has been available only in connection with proceedings over an individual's right to hold an office or position. *See, e.g., Johnson v. Manhattan Ry. Co.,* 289 U.S. 479, 502, 53 S.Ct. 721, 729, 77 L.Ed. 1331 (1933); *Newman v. Frizell,* 238 U.S. 537, 35 S.Ct. 881, 59 L.Ed. 1446 (1915); *Barany v. Buller,* 670 F.2d 726, 735 (7th Cir.1982).

The district court correctly dismissed both *quo warranto* claims with prejudice.

## V. RICO

Sundance also contends that the loan transaction violates the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962. Section 1962 proscribes the use of income derived from the "collection of an unlawful debt" to acquire an interest or establish or operate an enterprise engaged in or affecting interstate commerce, 18 U.S.C. § 1962(a); the acquisition or maintenance of any interest in an enterprise engaged in or affecting interstate commerce, 18 U.S.C. § 1962(b); conducting or participating in the conduct of an enterprise through the collection of an unlawful debt, 18 U.S.C. § 1962(c); and conspiring to violate any of the above. 18 U.S.C. § 1962(d).

For purposes of this section, "unlawful debt" means a debt

(A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, *or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury,* and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, *or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate*

18 U.S.C.A. § 1961(6) (1984) (emphasis supplied). Any person injured in his or her business or property by reason of a violation of section 1962 may recover treble damages. See 18 U.S.C. § 1964(c).[15] Sun-

---

**14.** We address the merits of Sundance's state *quo warranto* claim because the district court did. Sundance's other state law claims, which the district court dismissed for lack of subject matter jurisdiction after it dismissed all the federal claims, should be reconsidered upon remand in light of our conclusion that it has jurisdiction over the HOLA claim for injunctive relief.

**15.** The RICO standing provision governing damages, 18 U.S.C. § 1964(c), is identical to that of the HOLA, BHCA, and Clayton Act damages

provisions. It is by no means clear that Sundance has standing to raise a RICO claim although there is evidence that Congress intended that the standing provision under RICO be construed more liberally than the similar provision of the Clayton Act. *See, e.g.,* Report of American Bar Association Antitrust Division, 115 Cong.Rec. 6995 (March 20, 1969) (rejecting resort to antitrust laws because a RICO litigant would have to "contend with a body of precedent—appropriate in a purely antitrust context—setting strict requirements on questions such

dance alleges that Community's receipt of the two motels as consideration for the loan constituted a taking of illegal interest in violation of federal usury laws, entitling it to recover treble damages.

To make out a claim that what was collected was an "unlawful debt" within the meaning of RICO, Sundance must allege facts sufficient to prove, *inter alia,* that [1] the debt was unenforceable in whole or in part because of state or federal laws relating to usury, [2] the debt was incurred in connection with the "business of lending money ... at a [usurious] rate," ... [3] the usurious rate was at least twice the enforceable rate ... [4] as a result of the above confluence of factors, it was injured in its business or property.

*Durante Bros. and Sons, Inc. v. Flushing Nat. Bank,* 755 F.2d 239, 248 (2d Cir.1985) *cert. denied,* 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1986); *see Malley Duff & Associates v. Crown Life Ins. Co.,* 792 F.2d 341, 348 (3rd Cir.1986), *aff'd,* —— U.S. ——, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). According to *Durante Bros. & Sons,* this listing of elements that must be proven to establish civil RICO liability for collection

of unlawful debt "makes clear that the civil RICO action is not simply an action to recover excessive interest or to enforce a penalty for the overcharge. RICO is concerned with evils far more significant than the simple practice of usury." 755 F.2d at 248. We agree.

 Once the requisites of establishing an unlawful debt under section 1962 are set forth, it is clear that Sundance fails to make out a claim for relief. Sundance argues that the building of the motels was unlawful because of federal, not state,[16] usury laws, and alleges that subsection B of section 1464(q)(1) of HOLA, and 12 C.F.R. §§ 555.19 [17] and 545.32(b)(3) [18] of the Federal Home Loan Bank Board regulations constitute such laws. However, neither the Bank Board regulations nor HOLA can be fairly characterized as "laws relating to usury," because they do not limit the *amount* of interest that a bank or other lending institution can charge. Rather, they address only the method by which they may collect interest, or the kind of credit or property that they may receive in return for a loan. Because Sundance has not alleged a violation of a law relating to

as 'standing to sue' and 'proximate cause'"); Remarks of Senator McClellan, 115 Cong.Rec. at 9567 ("There is ... no intention here of importing the great complexity of antitrust law enforcement into this field."); *Schacht v. Brown,* 711 F.2d 1343, 1358 (7th Cir.), *cert. denied,* 464 U.S. 1002, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983); Blakey, "The RICO Civil Fraud Action in Context: Reflections on *Bennett v. Berg,*" 58 Notre Dame L.Rev. 237, 255 n. 52 (1982) ("any suggestion that RICO actions be limited by antitrust-type limitations—'competitive,' 'commercial,' or 'direct/indirect' injuries—flies in the face of the very consideration that led to the drafting of RICO as a separate statute from the antitrust statutes that are so limited."). However, appellees do not argue that Sundance lacks standing under RICO. Rather than raise the standing issue *sua sponte, see In re Weaver,* 632 F.2d 461, 462 n. 6 (5th Cir.1980), we instead dismiss the claim on the merits. Where the "jurisdictional question is complex and the appeal is without merit," we need not address the jurisdictional issue first. *Wolder v. United States,* 807 F.2d 1506, 1507 (9th Cir.1987) (per curiam) (citing *Norton v. Mathews,* 427 U.S. 524, 532, 96 S.Ct. 2771, 49 L.Ed.2d 672 (1976); *Secretary of Navy v. Avrech,* 418 U.S. 676, 677–78, 94 S.Ct. 3039, 3039–40, 41 L.Ed.2d 1033 (1974); *Lehner v. United States,* 685 F.2d 1187, 1189–90 (9th Cir.

1982) *cert. denied,* 460 U.S. 1039, 103 S.Ct. 1431, 75 L.Ed.2d 790 (1983). Here, the standing issue is complex—there are no cases on point—and Sundance's arguments on the merits are without substance.

16. On appeal, Sundance does not argue that the loan was inconsistent with state usury laws. As the district court pointed out, R.C.W. 19.52.090 prevents corporations from pleading the defense of usury or maintaining any action thereon.

17. 12 C.F.R. § 555.19 governs whether and to what extent the receipt of a share of the income generated by the security property or of a corporate borrower, or any similar participation with the borrower in the loan project, constitutes an unauthorized acquisition of an equity interest.

18. 12 C.F.R. § 545.32(b)(3) authorizes an association to receive a portion of the consideration for making a real estate loan in the form of a percentage of the amount by which the current market value of the property, during the loan term or at maturity, exceeds the original appraised value or as provided in 12 C.F.R. § 555.19.

usury, its RICO claim is clearly without merit.[19]

## VI. CONCLUSION

As a successor in interest to the property used as security for the loan, Sundance enjoys standing under HOLA to challenge the legality of the loan transaction and to seek injunctive relief from threatened foreclosure, but not to assert a claim for damages. The RICO claim was also properly dismissed, as were the federal and state *quo warranto* claims. Because jurisdiction exists over the HOLA claim for injunctive relief, on remand the district court should reconsider its decision regarding the remaining pendent state law claims.

Accordingly, we remand the case for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

**19.** Sundance's RICO claim may well fail for other reasons as well. For example, the legislative history of RICO strongly suggests that section 1962 was not directed toward banking institutions. The purpose of requiring, in the definition of "unlawful debt," that the usurious rate be at least twice the enforceable rate was "to limit the effect of this definition to cases of clear 'loan-sharking.'" S.Rep. No. 91–617, 91st Cong. 1st Sess. 158–59 (1969). *See also Durante Bros. and Sons, Inc.,* 755 F.2d at 250. Indeed, the elimination of loan sharking was one of Congress' principal aims in enacting the statute. S.Rep. No. 617, 90th Cong., 2d Sess. 78–80; H.R. Rep. No. 1574, 90th Cong., 2d Sess. 5. *See also United States v. Biasucci,* 786 F.2d 504, 512 (2d Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986). The provision was therefore not directed toward banks or other lending institutions. As the second circuit observed in *Durante Bros. and Sons, Inc.,*

The inclusion of "collection of unlawful debt" as a major predicate for RICO liability seems to have been an explicit recognition of the evils of loan sharking, and there is no indication that Congress was taking aim at legitimate banking institutions.

755 F.2d at 250. In light of the purposes of section 1962, it would seem that the transaction here does not constitute loan sharking and therefore cannot be characterized as unlawful debt within the meaning proscribed by Congress when it enacted RICO.

Furthermore, even were we to assume that the building of motels constitutes an unlawful debt, there is no allegation in Sundance's complaint that Community was in the business of making such usurious transactions. Nor does Sundance allege that Community received a rate on its loan of more than twice the permissible rate. Essential requisites of the RICO test are therefore not met by Sundance's complaint.